State Representative David M. TRAVIS, State Senator Fred Risser, State Representative Robert K. Zukowski, State Representative Eugene Hahn, State Representative Michael D. Huebsch, David Zweifel and Pamela Moorshead, Plaintiffs,

and

Roger D. Cross, in his official capacity as Administrator of the Division of Motor Vehicles of the Wisconsin Department of Transportation, and the Division of Motor Vehicles of the Wisconsin Department of Transportation, Realigned Plaintiffs,

v.

Janet RENO, Attorney General of the United States, and the United States of America, Defendants.

No. 97–C–701–C.

United States District Court, W.D. Wisconsin.

June 9, 1998.

Jon Deitrich, Adelman, Adelman, & Murray, Milwaukee, WI, for Travis, David M.,

Risser, Fred, Zukowski, Robert K., Hahn, Eugene, Huebsch, Michael D., Zweifel, David, Moorshead, Pamela, Plaintiffs.

Susan K. Ullman, Assistant Attorney General, Madison, WI, for Cross, Roger D., Motor Vehicles of WI Dept. Transp, Plaintiffs.

Craig M. Blackwell, Federal Programs Branch, Washington DC, for Reno, Janet, Defendant.

Leslie Herje, Asst. U.S. Attorney, Madison, WI, for United States of America, Defendant.

## OPINION AND ORDER

CRABB, District Judge.

In this civil action for declaratory and injunctive relief, plaintiffs challenge the Driver's Privacy Protection Act of 1994, 18 U.S.C. §§ 2721–2725, which prohibits states from disclosing "personal information" collected by their motor vehicle departments in connection with automobile and driver's license registration except for certain permissible uses. Plaintiffs contend that the act violates the First, Tenth and Eleventh Amendments as well as the Guarantee Clause of Article IV of the Constitution and they seek an order enjoining enforcement of the act. Defendants contend that even if the act runs afoul of the Tenth Amendment, Congress has authority to pass it under the Fourteenth Amendment because it is an attempt to enforce the right of privacy in the nondisclosure of confidential information.

The case is before the court on the motion of defendants Janet Reno and United States of America to dismiss for lack of subject matter jurisdiction and for failure to state a claim on which relief may be granted. In addition, both sets of plaintiffs have filed motions for summary judgment. I conclude that the act forces state officials and state employees to administer and enforce a federal regulatory scheme in violation of the Tenth Amendment. Furthermore, the act is not a valid exercise of Congress's authority under § 5 of the Fourteenth Amendment because the right of privacy does not encompass the type of information covered by the act.

Defendants raise compelling doubts about the standing of the original plaintiffs, Travis, Risser, Zukowski, Hahn, Huebsch, Zweifel and Moorshead, to bring their claims. However, there is no need to reach the merits of these arguments. It is undisputed that the state plaintiffs, Cross and Division of Motor Vehicles, are proper parties to this action; both sets of plaintiffs raise Tenth Amendment challenges; and resolution of this issue in favor of the state plaintiffs is dispositive of the entire case. For the same reasons, there is no need to address plaintiffs' arguments regarding the First and Eleventh Amendments or the Guarantee Clause. The state plaintiffs' motion for summary judgment will be granted, defendants' motion to dismiss will be denied with prejudice and the original plaintiffs' motion for summary judgment will be denied without prejudice.

As an initial matter, I note that even though the State of Wisconsin is not a stranger to this court, the state plaintiffs have disregarded this court's standing procedures to be followed on motions for summary judgment by citing numerous factual propositions not contained in their proposed findings of fact. These proposed facts will be disregarded. For the sole purpose of deciding this motion, I find from the parties' proposed findings of fact and from the record that there is no genuine dispute with respect to the following material facts.

## UNDISPUTED FACTS

Defendant United States of America is a sovereign constitutional government of those limited enumerated powers specified in and restrained by the United States Constitution. Defendant Janet Reno is Attorney General of defendant United States and is responsible for the enforcement of the criminal and civil penalties that may be imposed pursuant to the Driver's Privacy Protection Act.

Plaintiffs David Travis, Robert Zukowski, Eugene Hahn and Michael D. Huebsch are duly elected members of the Wisconsin Assembly. Plaintiff Fred Risser is a duly elected member of the Wisconsin Senate. Along with other legislators, plaintiffs Travis, Zukowski, Huebsch and Risser are responsible for making decisions about issues facing state government. Plaintiff David Zweifel is the editor of the Capitol Times, a Madison newspaper, and president of the Wisconsin Freedom of Information Council, an organization composed of representatives of state media outlets dedicated to preserving maximum public access to government records. Plaintiff Pamela Moorshead is an attorney licensed to practice law in the state of Wisconsin. Much of her practice concentrates on the defense of individuals charged with criminal and traffic violations.

Plaintiff Roger Cross is Administrator of plaintiff Division of Motor Vehicles of the Wisconsin Department of Transportation. Plaintiffs Cross, Division of Motor Vehicles and their officers and employees are responsible for implementing the Driver's Privacy Protection Act. They have had to develop a form to ascertain whether individuals requesting driver record information are entitled to personal information under the act. In addition, the state plaintiffs have had to train employees and monitor their compliance with the act, mail a form to bulk mail account holders, review completed forms, answer questions about the act and send forms to individuals upon request. Congress has provided no federal funds to states for such activities. The state plaintiffs have received numerous complaints about restrictions imposed by the act. Plaintiff Division of Motor Vehicles receives approximately $8 million each year in revenue from sales of driving record abstracts to paying customers at a rate of $3 – 4 per record. It is possible that implementation of the act will have adverse effects on this revenue stream.

Recently, the original plaintiffs, through counsel, requested the driver record information of Louis Kent Ostrom of Madison. The Wisconsin State Journal had reported that Ostrom had been arrested for drunk driving and destruction of property while on his way to court for an appearance on an earlier charge of drunk driving. Plaintiffs requested this information to determine whether Ostrom was subject to a court-ordered interlock device and, if so, whether he had complied with that order. Counsel for plaintiffs Cross and the Division of Motor Vehicles refused to grant this request because of the act.

## OPINION

### A. *Motor Vehicle and Driver Record Information under Federal and Wisconsin Law*

The Driver's Privacy Protection Act prohibits state motor vehicle departments from disclosing personal information obtained in connection with a motor vehicle record. 18 U.S.C. § 2721. The act defines "personal information" as anything "that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip code), and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." § 2725(3). There are numerous exceptions to the general rule against disclosure. States must disclose information in connection with various matters related to vehicle and driver safety and to carry out certain federal statutes related to driving and automobiles. § 2721(b). In addition, Congress has provided fourteen "permissible uses" for which information may be disclosed. § 2721(b)(1) –(14). For example, state motor vehicle departments may release personal information for use by a governmental agency, insurer, tow truck operator, or licensed private investigator. Also, information may be released in connection with judicial or arbitral proceedings, for bulk distribution and to anyone who has written permission of the individual to whom the information pertains. Finally, motor vehicle departments may allow individuals to opt out of these restrictions, thereby permitting free disclosure of any information provided to the departments by such individuals. § 2721(b)(11). Authorized recipients of personal information are prohibited from reselling or redisclosing information except as provided in the act. § 2721(c).

State motor vehicle departments, including plaintiff Division of Motor Vehicles, face civil penalties of $5,000 a day for each day they maintain a policy or practice of substantial noncompliance with the act. § 2723(b). Persons who violate the act knowingly, including plaintiff Cross and the officers and employees of plaintiff Division of Motor Vehicles, face criminal fines. § 2723(a). In addition, persons may be subject to individual civil actions for actual and punitive damages and other sanctions for knowingly disclosing, obtaining or using any personal information in violation of the act. § 2724. The act defines "person" as "an individual, organization or entity, but does not include a State or agency thereof." § 2725(2).

Under Wisconsin law, driver license and motor vehicle registration information is a public record. Wis.Stat. §§ 19.35(1)(a), 341.17(6), 343.24(1) and (2m). Custodians of driver record information are prohibited from requiring persons requesting such information to disclose their names or the purposes of their request. § 19.35(1)(i).

### B. *Fourteenth Amendment*

■ The Supreme Court has indicated that when Congress passes a law pursuant to § 5 of the Fourteenth Amendment the limitations on congressional authority imposed by the Tenth Amendment are "attenuated" because the post-Civil War amendments "were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *Gregory v. Ashcroft,* 501 U.S. 452, 468, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (citation and quotation marks omitted). Defendants observe that the Court has located the right to privacy in the Fourteenth Amendment, *see Whalen v. Roe,* 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and argue that Congress passed the Driver's Privacy Protection Act pursuant to § 5 of this amendment to safeguard the privacy of personal information collected by state motor vehicle departments. Thus, according to defendants, even if the act runs afoul of the Tenth Amendment, it is constitutional under the Fourteenth Amendment.

In *Pesce v. J. Sterling Morton High School,* 830 F.2d 789, 795–796 (7th Cir.1987) (citing *Whalen,* 429 U.S. at 598–600, 97 S.Ct. 869), the Seventh Circuit concluded that the right of privacy encompasses an interest in the confidentiality of private information, holding that an individual cannot be compelled to divulge such information under certain circumstances. The court acknowledged that the Fifth Circuit had held that the right of privacy might prohibit the government from disclosing private information, but it noted that the circumstances in that case, *Fadjo v. Coon,* 633 F.2d 1172 (5th Cir.1981),

were not those of plaintiff Pesce. (Fadjo alleged that the state breached his federal right of confidentiality when it released private information to insurance investigators; Pesce was disciplined for failing to disclose to school officials the sexual abuse of a student he learned about in a confidential counseling session.) *See Pesce*, 830 F.2d at 797 (citing *Fadjo*, 633 F.2d at 1175–1176). Although other courts of appeal have joined the Fifth Circuit in concluding that there is a right to privacy in the nondisclosure of private information, some circuits are skeptical of this notion. *See American Federation of Government Employees v. Department of Housing and Urban Development*, 118 F.3d 786, 791–793 (D.C.Cir.1997) (collecting cases and "expressing grave doubts as to the existence" of such a right).

■ Even assuming that there is a constitutional right to privacy in the nondisclosure of private information, defendants breeze by the operative question whether information protected by the act is "private." It is not. Because the right of privacy is not absolute, *see Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir.1990), the Constitution does not prohibit disclosure of all information about an individual. There must be a legitimate expectation of privacy in the confidentiality of information to justify constitutional protection. *See id.* "The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material which the state possesses." *Mangels v. Pena*, 789 F.2d 836, 839 (10th Cir.1986). Under this standard, courts have held that there is a legitimate expectation of privacy regarding medical records, *see United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir.1980), the contents of a personal diary, *see Sheets v. Salt Lake County*, 45 F.3d 1383, 1387–1388 (10th Cir.1995), and financial records. *See Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 115 (3d Cir.1987). However, privacy interests are not implicated by an internal investigation report conducted by a city fire department indicating that certain firefighters had used illegal drugs, *see Mangels*, 789 F.2d at 839, or information regarding an individual's marital and family criminal history that is "freely available in public records." *Walls*, 895 F.2d at 193.

■ The act prohibits disclosure of "an individual's photograph, social security number, driver identification number, name, address ..., telephone number, and medical or disability information...." 18 U.S.C. § 2725(3). There is no constitutional right to privacy in the disclosure of this information because there is no legitimate expectation of confidentiality regarding it. One's name, address and telephone number are available to anyone with a phone book. Although the other information subject to the act is arguably more personal in nature, it is hardly more sensitive than one's marital, drug abuse and family criminal history. Driver identification and social security numbers are disclosed regularly, usually when cashing a check, applying for credit or in any situation in which an individual must produce a driver's license. Defendants concede this point, but counter that individuals "only expect to produce their driver's licenses ... selectively and voluntarily." Defs.' Br. in Opp. to Mot. for Summ. J. (Dkt.# 26) at 13. Though defendants may be correct, the level of confidentiality between individuals and their doctors and accountants and the sensitivity of information entrusted to these professionals is not on par with the type of transactions engaged in with supermarket cashiers and others who are frequently on the receiving end of information subject to the act. In any event, plaintiffs note correctly that it is doubtful whether the act will safeguard anyone's privacy. The act is riddled with exceptions that any determined, resourceful person could exploit, particularly since there are no standards for verifying the truth or accuracy of claims made by individuals requesting information.

## C. Tenth Amendment

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Plaintiffs contend that the Driver's Privacy Protection Act violates the Tenth Amendment because it "commandeers" Wisconsin within the mean-

ing of two recent Supreme Court opinions, *Printz v. United States,* —— U.S. ——, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) and *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). To date, three district courts have analyzed whether the act runs afoul of the Tenth Amendment. *See Pryor v. Reno,* 998 F.Supp. 1317 (M.D.Ala. 1998) (held constitutional); *Condon v. Reno,* 972 F.Supp. 977 (D.S.C.1997) (held unconstitutional); *State of Oklahoma ex rel. Oklahoma Dept. of Public Safety v. United States,* 994 F.Supp. 1358 (W.D.Okla.1997) (same).

■ Although Tenth Amendment jurisprudence has been a moving target over the past two decades, *see, e.g., National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976); *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985) (overruling *National League of Cities* ), the Court has recognized consistently that the amendment is one of many ways in which the Constitution preserves a structural balance between a federal government of limited powers and fifty autonomous states. Just as the Bill of Rights prohibits the federal government from encroaching upon certain individual liberties and just as the Commerce Clause confines federal lawmaking authority to matters related to interstate commerce, the Tenth Amendment "restrains the power of Congress." *New York,* 505 U.S. at 156, 112 S.Ct. 2408. Such restraints do not exist for the sake of restraint itself. Rather, they are an acknowledgment that "the Constitution established a system of dual sovereignty ... in which States surrendered many of their powers to the new Federal Government ... [but] retained a residual and inviolable sovereignty." *Printz,* —— U.S. at ——, 117 S.Ct. at 2376 (citations and quotation marks omitted). In this sense, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the states." *New York,* 505 U.S. at 157, 112 S.Ct. 2408. Such limits are "not derived from the text of the Tenth Amendment itself," but from other constitutional provisions. *Id.* In essence, the Court has reasoned that the Tenth Amendment not only reserves certain powers to the states but sets some structural limits on the way in which Congress may exercise its limited powers.

Under this formulation, although Congress may not "directly compel[ ] [states] to enact or enforce a federal regulatory program," *Hodel v. Virginia Surface Mining Reclamation Ass'n, Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), Congress has at its disposal several acceptable methods of "encouraging a State to regulate in a particular way" and "influencing a State's policy choices." *New York,* 505 U.S. at 166, 112 S.Ct. 2408. For example, Congress may use its spending power to "attach conditions on the receipt of federal funds" so long as a nexus exists between these conditions and the purpose of the federal spending. *See id.* at 167, 112 S.Ct. 2408. In addition, Congress may give states the option of regulating private Commerce Clause activity according to federal standards or "having state law preempted by federal regulation." *Id.* at 167–168, 112 S.Ct. 2408 (citing various environmental laws as examples of this so-called "cooperative federalism").

In *New York,* 505 U.S. at 175, 112 S.Ct. 2408, the Court struck down a provision of the Low–Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021b–2021j. The offending provision presented states with a choice: either they could take title to radioactive waste generated within their borders or regulate storage and disposal of such waste according to the direction of Congress. The Court held that this provision went too far:

Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the states a choice between the two.

\* \* \* \* \* \*

Respondents emphasize the latitude given to the States to implement Congress' plan. The Act enables the States to regulate pursuant to Congress' instructions in any number of different ways.... This line of reasoning, however, only underscores the critical alternative a State lacks:

A State may not decline to administer the federal program. · No matter which path the State chooses, it must follow the direction of Congress.

*Id.* at 176–177, 112 S.Ct. 2408. In summary, the Court declared that the "Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 188, 112 S.Ct. 2408. In *Printz,* —— U.S. at ——, 117 S.Ct. at 2384, the Court took this notion one step further, holding that the strictures of the Tenth Amendment are not limited solely to federal authority over state legislatures: "The Federal Government may ... [not] command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." Unlike the "take title" provision in *New York,* the statute at issue in *Printz* did not compel state lawmakers to adopt federal regulations or legislation. However, it required "state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme." *Printz,* —— U.S. at ——, 117 S.Ct. at 2369. The Court held that no constitutionally significant distinction could be drawn between compelling a state legislature to make federal law and compelling state officials to enforce federal law. *Id.* 117 S.Ct. at 2380.

*Printz* involved a challenge to select provisions of the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922, that required local law enforcement officers to perform three duties related to the sale of firearms: 1) conduct a background check on individuals interested in purchasing a gun; 2) provide would-be purchasers who are determined to be ineligible to own a firearm with a written statement of the reason for this determination; and 3) destroy all records related to the background checks of individuals determined to be eligible to own a firearm. *See Printz,* —— U.S. at ——, 117 S.Ct. at 2369. The second obligation applied only if an officer chose to notify a gun dealer that a pending sale would be illegal. *Id.* The Court noted that although the act did not require such notification and although officers

> are subjected to no federal requirement that they prevent the sales determined to be unlawful (it is perhaps assumed that their state-law duties will require preven-

tion or apprehension), they are empowered to grant, in effect, waivers of the federally prescribed 5–day waiting period for handgun purchases by notifying the gun dealers that they have no reason to believe the transactions would illegal.

*Id.* As already indicated, the Court held that a federal law that directs state officials to administer or enforce a federal regulatory scheme violates the Tenth Amendment. Of course, this begs the question of identifying such laws. Unfortunately, the Court provided little explicit guidance apart from describing the Brady Act and stating that from this description it was "apparent" that the act directed state law enforcement officers to administer a federal regulatory scheme. *Id.* Nevertheless, the Court provides some illumination in its discussion of why laws such as the Brady Act and the "take title" provision violate the Tenth Amendment.

In *New York* and *Printz,* the Court did not come to the defense of state sovereignty for the purpose of preserving or increasing state power. Instead, the Court recognized that when federal regulations bear the imprimatur of a state because they are enacted by state lawmakers at the direction of Congress, a fundamental attribute of sovereignty is threatened: democratic accountability. *See New York,* 505 U.S. at 168–169 and 180–183, 112 · S.Ct. 2408 (discussing ways in which state and federal officials could shift responsibility for siting waste incinerator in absence of Tenth Amendment limitations). Applying this concept to the Brady Act, the Court stated:

> By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for "solving" problems without having to ask their constituents to pay for the solutions with higher federal taxes. And even when·the States are not forced to absorb the costs of implementing a federal program, they are still put in the position of taking the blame for its burdensomeness and for its defects.... Under the present law, for.example, it will be the CLEO [law enforcement officer] and not some federal official who stands between the gun·purchaser

and immediate possession of his gun. And it will likely be the CLEO, not some federal official, who will be blamed for any error (even one in the designated federal database) that causes purchasers to be mistakenly rejected.

*Printz,* —— U.S. at ——, 117 S.Ct. at 2382.

■ The Driver's Privacy Protection Act forces state officials to administer and enforce a federally enacted regulatory program in violation of the Tenth Amendment. The act establishes a detailed set of rules to control the circumstances under which Wisconsin may disclose certain information in its driver's license and motor vehicle records to third parties; these rules displace conflicting policies regarding disclosure established by Wisconsin legislators through the state's open records law; state officials are responsible for insuring that this information is disclosed only for designated purposes specified by the federal rules; and the federal government has no role in this process, financially or otherwise. If this does not describe a federal law that directs state officials to administer or enforce a federal regulatory program, the standard articulated by the Supreme Court in *New York* and *Printz* has done great damage to the English language. That the act presses state officials into federal service is confirmed further by consideration of the way in which it will diminish accountability. To paraphrase the Court in *Printz,* 117 S.Ct. at 2382, the Driver's Privacy Protection Act will put state officials in the position of taking the blame for the act's burdensomeness and defects because it will be some state official who stands between an individual interested in obtaining information subject to the act and possession of this information and it will be a state official who is blamed for any error that causes an applicant to be rejected mistakenly. That states may avoid obligations imposed by the act by "choosing" to close their motor vehicles records to the public entirely does not avoid this problem because states, not the federal government, will remain accountable to their citizens for such a decision. Thus, although defendants insist that the act implicates nothing more remarkable than Congress's authority under the preemption clause, *New York* and *Printz* establish that when the federal government preempts and such preemption entails the administration or enforcement of federal regulations, the federal government must take political responsibility and pay the costs of regulation—something that Congress has declined to do in this instance.

Defendants assert that states are not required to administer or enforce the rules and exceptions provided in the Driver's Privacy Protection Act but do not explain how these provisions are administered and enforced in the first place. Instead, defendants suggest two ways in which the act can be distinguished from a law that presses state officials into federal service. Defendants draw a distinction between: 1) positive and negative injunctions, maintaining that while the Brady Act required local law enforcement officers to take certain actions (conduct background checks), the Driver's Privacy Protection Act prohibits state officials from taking certain actions (releasing personal information to the wrong people for the wrong purposes); and 2) Congressional enactments that require states to regulate third parties and those that apply to the states directly and are an effort to resolve state-created problems.

■ There is no explicit support in *New York* or *Printz* for anchoring Tenth Amendment jurisprudence in these distinctions. Rather, they are based loosely on a series of opinions involving so-called laws of general applicability that have survived Tenth Amendment scrutiny. *See Maryland v. Wirtz,* 392 U.S. 183, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (Fair Labor Standards Act); *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (same); *Garcia,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (same); *Fry v. United States,* 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363 (1975) (Economic Stabilization Act); *United Transportation Union v. Long Island R. Co.,* 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982) (Railway Labor Act); *Equal Employment Opportunity Commission v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (Age Discrimination in Employment Act); *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). In *Printz,* —— U.S. at ——, 117 S.Ct. at 2383 and *New York,* 505

U.S. at 160, 112 S.Ct. 2408, the Court acknowledged that it has drawn a consistent distinction between laws of general applicability and laws targeted exclusively at states. However, the Court disowned any similarity between laws of general applicability and the Brady Act and the "take title" provision. Defendants are correct that the purpose of drawing a distinction between laws of general applicability and laws directed exclusively at states is not to suggest that the former are always constitutional and the latter are always unconstitutional or to create two different standards for evaluating Tenth Amendment claims. Rather, the distinction is one indication how much a congressional enactment upsets the structural balance between federal and state sovereignty, if at all.

By way of example, *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592, involved a federal law that effectively required states to issue registered bonds and stop issuing bearer bonds. The law applied with equal force to bonds issued by the federal government and private corporations. Responding to South Carolina's contention that the law required it to amend existing state statutes and figure out how to implement a system for issuing registered bonds, the Court stated that

> [s]uch "commandeering" is an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defects.

*Id.* at 514–515, 108 S.Ct. 1355. This law and the type of laws upheld in *National League of Cities* and *Fry* involved "the incidental application to the States of a federal law of general applicability." *Printz*, ── U.S. at ──, 117 S.Ct. at 2383. By contrast, "it is the whole object of the [Brady Act] to direct the functioning of the state executive, and hence to compromise the structural framework of dual sovereignty...." *Id.;* see also *New York*, 505 U.S. at 160, 112 S.Ct. 2408 (radioactive waste statute not example of legislation that applies equally to state and private parties alike). In *Printz*, the Court acknowledged that it has responded with greater deference to laws of general applicability and that a more forgiving analysis of the Brady Act might have been warranted had the act fit such a characterization. However, because laws such as the ones at issue in *Printz* and *New York* offend "the very principle of separate state sovereignty," any attempt to balance the relevant state and federal interests at stake is inappropriate. *Id.* When states must conform their policies regarding areas such as employment and bonds to the same federal regulations applicable to any other private employer or bond issuer, the threat to sovereignty is reduced, presumably because there is less cause for concern when Congress tells everyone what to do, as opposed to just the states. *See Garcia*, 469 U.S. at 554, 105 S.Ct. 1005 (San Antonio "faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet"). As explained by the Court in *Baker*, 485 U.S. at 514, 108 S.Ct. 1355, laws of general applicability may regulate state activities, but they do not "seek to control or influence the manner in which States regulate private parties."

■ To state the obvious, the Driver's Privacy Protection Act is not a law of general applicability. Only states collect driver's license and motor vehicle information and, if they so choose, disseminate it. By contrast, the taxation law in *Baker* applied generally to any state, federal or private entity that issued bonds; the employment laws in *Garcia, Fry,* and *Equal Employment Opportunity Commission v. Wyoming* applied generally to any state, federal or private employer. To be sure, the Driver's Privacy Protection Act restricts the way in which private parties who obtain personal information from a motor vehicle department may resell or redisclose such information and provides civil and criminal liability for those who violate these restrictions. *See* 18 U.S.C. §§ 2721(c) and 2722–2725. These provisions establish that it is not the *entire* object of the act to direct the functioning of state motor vehicle departments. However, the act's applicability to private parties is incidental to its foremost purpose: regulating the way in which states disseminate information collected by their motor vehicle departments. Contrary to defendants' assertion, the act does not attempt

to regulate the market for information generally but only a small, state-controlled facet of this market. The Driver's Privacy Protection Act does not resemble this "general applicability" line of cases in any other significant way.

In support of the position that act's injunctions are positive as opposed to negative and that the act directly regulates state-created problems, defendants cite the following passage from *Pryor*, 998 F.Supp. at 1331:

The DPPA does not violate the Tenth Amendment, as it is a direct prohibition on the State from releasing personal DMV records for impermissible purposes, rather than a regulation requiring the State to enforce the federal government's ban on personal DMV disclosures.

Also, in *Pryor*, the district court concluded that the act differs from the provisions at issue in *Printz* because "the DPPA neither asks State officials to arrest or report violators of the DPPA, nor does it require States to ensure that state citizens do not use or otherwise re-disclose personal DMV information." *Id.* at 1329. With respect, I disagree with these conclusions. Although the obligations imposed upon state employees by the Driver's Privacy Protection Act may not be as onerous as those created by the Brady Act, the act is not self-enforcing or self-administering: someone must do something to insure that the state is in compliance with the act. Specifically, states must disclose personal information to carry out various federal statutes, *see* 18 U.S.C. § 2721(b), and state employees are required to review requests for information to determine whether such requests are for permissible uses. The act contains no explicit instructions regarding the extent to which state employees must investigate and confirm the accuracy of claims made by individuals requesting information. However, this does not mean that the states' obligation is not "affirmative," particularly when state employees face personal liability for violating the act knowingly. Furthermore, contrary to the court's reading in *Pryor* of the Brady Act, nothing in the act required local law enforcement officers to arrest or report violators or stop unauthorized transactions. *See Printz*, —— U.S. at ——, 117 S.Ct. at 2369 ("The Act does not require the CLEO to take any particular

action if he determines that a pending transaction would be unlawful; he may notify the firearms dealer to that effect, but he is not required to do so"). Stripped of this distinction, the Driver's Privacy Protection Act and the Brady Act each require states to regulate the conduct of third parties to the extent that states are forced to control who may obtain access to certain things, whether information or handguns, without the direct participation or financial backing of the federal government. Finally, the Supreme Court has never endorsed the notion that the constitutionality of a federal law challenged under the Tenth Amendment turns on whether the law is an attempt by Congress to resolve problems attributable to states, as opposed to private parties or the federal government. Regardless who is responsible for the expanding market in consumer information and the proliferation of handguns and radioactive waste, Congress must exercise its authority within the structural limits delineated by the Constitution and the Supreme Court should it choose to enlist the states in addressing these problems.

### ORDER

IT IS ORDERED that:

1. The motion of defendants Janet Reno and United States of America to dismiss for lack of subject matter jurisdiction and for failure to state a claim on which relief may be granted is DENIED;

2. The motion for summary judgment of plaintiffs David Travis, Fred Risser, Robert Zukowski, Eugene Hahn, Michael Huebsch, David Zweifel and Pamela Moorshead is DENIED without prejudice;

3. The motion for summary judgment of plaintiffs Roger Cross and the Division of Motor Vehicles of the Wisconsin Department of Transportation is GRANTED;

4. The Driver's Privacy Protection Act violates the Tenth Amendment of the United States Constitution.

5. Defendants are enjoined permanently from enforcing the Driver's Privacy Protection Act against plaintiffs.