**STATE OF OKLAHOMA, ex rel., the OKLAHOMA DEPARTMENT OF PUBLIC SAFETY, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

**No. Civ–97–1423–R.**

United States District Court, W.D. Oklahoma.

Sept. 17, 1997.

John K. Lindsey, Oklahoma Department of Public Safety, Douglas F. Price, James Robert Johnson, Office of the Attorney General, Oklahoma City, OK, for Plaintiff.

Craig M. Blackwell, Department of Justice, Federal Programs Branch, Washington, DC, Defendant.

### *ORDER*

DAVID L. RUSSELL, Chief Judge.

This matter comes before the Court on the Application for Preliminary Injunction, filed by Plaintiff, the State of Oklahoma ("Oklahoma"), ex rel. the Department of Public Safety ("DPS"). Plaintiff seeks an injunction prohibiting Defendant, the United States of America, from enforcing the Driver's Privacy Protection Act of 1994 ("DPPA" or "the Act"), P.L. 103–322, §§ 300001–300003, which was scheduled to take effect on September 13, 1997. Plaintiff contends that the Act, codified at 18 U.S.C. §§ 2721–25 is unconstitutional. On September 15, 1997, the Court issued an Order, wherein it granted Plaintiff's requested relief, noting that further elaboration would follow. This Order disposes of all matters before the Court.[1]

### *BACKGROUND*

The DPPA regulates the dissemination and use of "personal information" contained in state motor vehicle records.[2] Congress enacted the DPPA in 1994, alleging concern for a perceived national problem, the widespread availability of personal information from state motor vehicle records. Congress enacted the DPPA in part to combat the commercial practice of selling information obtained via driver's license applications and motor vehicle records. Congress also heard testimony that stalkers and other criminals have used motor vehicle information to locate their victims.

The DPPA took effect on September 13, 1997, and prohibits "a State department of motor vehicles, and any officer, employee, or contractor, thereof, [from] knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C. § 2721(a).[3] This prohibition, however, is not absolute. The DPPA sets forth specific exceptions to the prohibition. When a request is made by an appropriate person for an appropriate purpose, as defined by the statute, the state may disclose personal information. 18 U.S.C. § 2721(b)(1)-(14).[4] Additionally,

> [a] State motor vehicle department may establish and carry out procedures under which the department or its agents, upon

1. The parties agreed that the Court's decision with regard to the preliminary injunction should also serve as a decision on the merits of the action. The elements of a permanent injunction and a preliminary injunction are similar, the sole exception being that the movant must actually prevail, as opposed to showing a likelihood of success on the merits, in order to receive a permanent injunction. Therefore, the Court shall treat this as a resolution on the merits.

    The Court also notes that although this is a case of first impression in both this district and this circuit, on September 11, 1997, the United States District Court for the District of South Carolina, Columbia Division, the Honorable Dennis Shedd, ruled that the DPPA violates the Tenth Amendment of the United States Constitution.

2. Under the DPPA, "'personal information' means information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5–digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725.

3. The DPPA defines "motor vehicle record" as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." 18 U.S.C. § 2725(1).

4. The permissible exceptions permit disclosure for use by government agencies, for use in connection with motor vehicle safety and theft, emissions, recalls, advisories, market research activities, for use by a legitimate business to verify the accuracy of personal information submitted by employees or contractors, for use in court or administrative proceedings, for use in research, so long as not published, for use by insurers, for use in providing notice to owners of towed vehicles, for use by private investigators, so long as the intended use is also permissible, for use by employer or insurer with regard to commercial drivers' license, for use in connection with the operation of private toll facilities, for use by a requester who has the written consent of the person whose information is sought and for any use authorized by the State that holds the record, if the use relates to the operation of a vehicle or public safety.

receiving a request for personal information that does not fall within one of the exceptions in subsection (b), may mail a copy of the request to the individual about whom the information was requested, informing such individual of the request, together with a statement to the effect that the information will not be released unless the individual waives such individual's right to privacy under this section

18 U.S.C. § 2721(d).

Prohibitions and limitations also extend to those persons who seek or receive information from state motor vehicle records. "It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title." 18 U.S.C. § 2722(a). Furthermore, "[i]t shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. § 2722(b).

Violation of the DPPA by either a State or Individuals carries a price. "A person who knowingly violates this chapter shall be fined under this title." 18 U.S.C. § 2723(a).[5] Civil remedies, including actual and punitive damages, as well as attorneys' fees, are available against any person who knowingly violates the Act. 18 U.S.C. § 2724. Furthermore, "[a]ny State department of motor vehicles that has a policy or practice of substantial noncompliance with this chapter shall be subject to a civil penalty imposed by the Attorney General of not more than $5,000 a day for each day of substantial noncompliance." 18 U.S.C. § 2723(b).

Oklahoma law currently provides that motor vehicle records are public record. The Department of Public Safety is required by Okla. Stat. tit. 47 § 6–117 to retain and file every application for a license it receives. It must note whether the application is granted or denied; and if denied, the basis thereof. All suspensions and revocations of licenses must be recorded, along with the reason for such action.

> The Department of Public Safety or any motor license agent upon request shall prepare and furnish a summary to any person of the traffic record of any person subject to the provisions of the motor vehicle laws of this state. Said summary shall include the enumeration of any motor vehicle accidents, reference to convictions for violations of motor vehicle laws, and any action taken against the person's privilege to operate a motor vehicle, as shown by the files of the Department for the three (3) years preceding the date of the request.

Okla. Stat. tit. 47 § 6–117(H). Motor vehicle records are also covered by the Oklahoma Open Records Act, which requires public access and imposes criminal penalties and civil liability on those public officials and public bodies who fail to comply. Okla. Stat. tit. 51 § 24A.17. Oklahoma law conflicts, in many regards, with the DPPA.[6]

Oklahoma challenges the constitutionality of the DPPA, arguing that it violates the Tenth Amendment, the Eleventh Amendment, and that Congress has exceeded the scope of its authority under the Commerce Clause. The Court finds that the DPPA violates that Tenth Amendment, and therefore no reason exists for the Court to consider Plaintiff's alternative arguments at this time. *See Clinton v. Jones,* —— U.S. ——, —— n. 11, 117 S.Ct. 1636, 1642 n. 11, 137

---

**5.** "Person" is defined by the Act as "an individual, organization or entity, but does not include a State or agency thereof." 18 U.S.C. § 2725(2).

**6.** During the September 12, 1997 hearing, the United States asserted that the State of Oklahoma lacks standing to challenge the DPPA, because the DPPA does not conflict with Oklahoma law. Defendant contends that Oklahoma law does not mandate the disclosure of information that must, under the terms of the DPPA, remain confidential. The Court notes, however, that based on the testimony of Bill Bruce, that the disclosure of certain items, such as drivers' license applications, would result in the disclosure of a person's address, which is personal information protected by the DPPA. Additionally, revealing a motor vehicle record, which can be obtained by providing a person's name and date of birth, would result in violation of the DPPA, because the person's driver's license number would be revealed. In some instances revealing the driver's license number is also revelation of the person's social security number, as often they are one in the same. Either way, the DPPA would be violated. The United States' argument that Oklahoma law does not directly conflict with the DPPA is without merit; and the Court finds that the State has standing to pursue this action.

L.Ed.2d 945 (1997); *New York v. United States of America*, 505 U.S. 144, 184, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

## DISCUSSION

Whenever called upon to judge the constitutionality of an Act of Congress— "the gravest and most delicate duty that this Court is called upon to perform," *Blodgett v. Holden*, 275 U.S. 142, 148 [48 S.Ct. 105, 107, 72 L.Ed. 206] (1927) (Holmes, J.)—the Court accords "great weight to the decisions of Congress." *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 102 [93 S.Ct. 2080, 2086, 36 L.Ed.2d 772] (1973). The Congress is a coequal branch of government whose Members take the same oath we do to uphold the Constitution of the United States. As Justice Frankfurter noted in *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164 [71 S.Ct. 624, 644, 95 L.Ed. 817] (1951) (concurring opinion), "we must have due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government."

*Rostker v. Goldberg*, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). Loyal to this obligation, the Court presumes that the challenged statute is valid. *I.N.S. v. Chadha*, 462 U.S. 919, 944, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

■ The State of Oklahoma contends that Congress has exceeded its authority and thereby violated the Tenth Amendment in enacting the DPPA, because the Act mandates that States invoke a federal regulatory scheme with regard to their own records.[7] The State relies on two opinions of the Supreme Court in support of its arguments, *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) and *Printz v. United States*, —— U.S. ——, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). In both

of these cases, the Supreme Court held statutes unconstitutional as violative of the Tenth Amendment.

The United States contends that these cases are inapplicable, and steers the Court toward three other Supreme Court cases, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988); and *E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). The United States argues that the Act does not violate the principles of dual sovereignty, but rather than the Act is mere direct regulation of those States that choose to disseminate personal information. Expectedly, the State contends that these cases are inapposite and not controlling. The Court concurs with the State and finds that *New York* and *Printz* are controlling.

In *New York*, the Supreme Court considered the constitutionality of Congressional regulation of radioactive waste, undertaken in certain provisions of the Low–Level Radioactive Waste Policy Amendments of 1985. The Court agreed that Congress possessed the authority under the Commerce Clause[8] to regulate the interstate waste disposal market; however, the Court found that the manner chosen for such regulation exceeded congressional authority under the Tenth Amendment. The Court found that Congress impermissibly sought to use States as implements of regulation.

"No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate." *Id.* at 178. After examining its prior cases involving federal encouragement of state action, including *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), and *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), the Court held that a particular provision in the law under consid-

---

**7.** The Tenth Amendment provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

**8.** The Commerce Clause provides that Congress has the power "[t]o regulate Commerce ... among the several States." Art. I., § 8, cl. 3.

eration was unconstitutional, because it attempted to employ the state government as a federal regulatory agency. The law did not merely provide encouragement, it mandated, by providing a Hobson's choice, that State's participate in the federal regulatory scheme.[9] The same can be said here.

The Supreme Court relied in large part on the intent of the Framers of the Constitution, who chose a system by which "Congress would exercise its legislative authority directly over individuals rather than over States." *Id.*, 505 U.S. at 165. "[E]ven where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or to prohibit those acts." *Id.* Congress may encourage States to regulate in a particular manner and may offer incentives to do so; however, it may not coerce States.

The Court continued by noting that Congress has authority under the Commerce Clause to regulate private activity and may offer States the choice of regulating according to federal standards or having their lesser standards preempted. This authority allowed Congress to enact legislation such as the Clean Water Act, 33 U.S.C. §§ 1251–1387, the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678, and the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901–6987. *Id.* at 168. The Court explained that Congress may regulate in this manner, because States are left with a choice as to whether or not they will comply by enacting their own regulations, based on Federal standards, or whether their less stringent regulations will be trumped. However, under the DPPA, States are not given any choice. They must comply or face fines from the Attorney General.

The DPPA requires both that States comply with the confidentiality requirements, and that States put in place methods for ensuring that information is not provided improperly. The only method for avoiding the administrative entanglement created by the DPPA, is to "opt-out" under § 2721(b)(11) and (b)(12), both of which require that the State ensure that every person applying for or renewing a license or title registration be given the opportunity to prevent disclosure of personal information. The State of Oklahoma processes approximately 1 million requests for motor vehicle information annually, and few of these requests, if any, are for bulk information. The system set forth in the DPPA would require Oklahoma to train DPS employees and the employees in approximately 270 tag agencies across the State on when and how records may be released. Additionally, the State would be required to monitor the tag agents to ensure their compliance with the federal standards.

Unlike the cases cited by the United States, the DPPA is not a law of general applicability, such as the Fair Labor Standards Act, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Tax Equity and Fiscal Responsibility Act of 1982, *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988), or the Age Discrimination in Employment Act, *E.E.O.C. v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). The United States argues that the law applies to both States and to persons receiving information from motor vehicle records, and therefore, the law is one of general applicability. However, even cursory review of the statute indicates that it is directed at States. The first sentence states that the Act applies to "a State department of motor vehicles, and any officer, employee, or contractor thereof." Although the law also prevents individuals from disseminating information received from the State, the law is directed not at the individuals, but at the State.

---

**9.** The Court ruled that the "take title" provision of the act was unconstitutional under the Tenth Amendment, and noted the following.

> The take title provision offers state governments a "choice" of either accepting ownership of waste or regulating according to the instructions of Congress.... Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two.... A choice between two unconstitutionally coercive regulatory techniques is no choice at all.

*Id.*, 505 U.S. at 175–76.

The DPPA is, like the statutory provision at issue in *New York*, "a simple command to state governments to implement legislation enacted by Congress. As we have seen, the Constitution does not empower Congress to subject state governments to this type of instruction." *Id.*, 505 U.S. at 176. The options given to States under the DPPA are not truly options. "A State may not decline to administer the Federal Program. No matter which path the State chooses, it must first follow the direction of Congress." As noted by the State of Oklahoma, the Department of Public Safety Employees and the tag agents authorized by the State of Oklahoma are, under the DPPA, conscripted by the federal government for purposes of enacting the DPPA. As shown in *New York*, this is impermissible. *Id.* at 178.

The State of Oklahoma also relies on *Printz*, wherein the Supreme Court held that certain provisions of the "Brady Act," directed at handgun control, exceeded Congress' authority under the Tenth Amendment. The "Brady Act" temporarily required the chief law enforcement officer ("CLEO") of certain locales to assist in the processing of permits for gun ownership. Upon receipt of a "Brady form," CLEOs were required to make efforts to determine whether the proposed sale was lawful.

The Court again turned to its history and the Framers for consideration of the interplay between the dual sovereignties of Federal and State government. The Court concluded, as it had in *New York*, that "[t]he Federal Government may not compel the States to implement, by legislation or *by executive action*, federal regulatory programs." *Id.*, 117 S.Ct. at 2380 (emphasis added).

In *Printz*, the United States argued that it was permissible for Congress to command state officials to assist in implementing federal law, so long as Congress does not compel States to make laws in their sovereign capacities. *Id.* The Supreme Court rejected the argument, as does this Court. "The federal Government may neither issue directives requiring States to address particular problems, nor command the States' officers, or those of their political subdivisions to administer or enforce a federal regulatory program." *Id.* at 2384. This, however, is

exactly what the DPPA attempts to do. It requires State motor vehicle agencies to create and maintain systems to enforce the federal law of non-disclosure. The DPPA falls squarely within the prohibitions of *Printz*.

The United States argues that the DPPA merely requires that States conform their conduct to federal standards. States are, under the DPPA, not required to enact any legislation in order to comply. However, the States are required to create and implement systems whereby those persons seeking information for a proper purpose, as defined by the Federal statute, are permitted access. The statutory scheme does not allow States any other manner of compliance and prevents, in many cases, the dissemination of personal information.

> States are not mere political subdivisions of the United States. State governments are neither regional offices nor administrative agencies of the Federal Government. The positions occupied by state officials appear nowhere on the Federal Government's most detailed organizational chart. The Constitution instead 'leaves to the several states a residuary and inviolable sovereignty.'

*New York*, 505 U.S. at 188 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed.1961)). The DPPA however, seeks to treat the Oklahoma Department of Public Safety as a subdivision of the United States. The Act, focusing on information gathered by the State, from its citizens, seeks to dictate when and to whom information may be released. The law is not one of general applicability and it is not a permissible undertaking given the limitations imposed on Congress by the Tenth Amendment.

In enacting the DPPA, Congress exceeded its limits under the Tenth Amendment. The power that Congress sought to exercise by dictating when and how States may disclose personal information from driver's license records is a power "not delegated to the United States by the Constitution, nor prohibited by it to the States, [and such power is therefore] reserved to the States." U.S. Const. amend. X. Accordingly, the Act is unconstitutional.

As noted throughout this Order, the State has established that if the United States is not enjoined from enforcing this law, that it will suffer irreparable harm. A fine of $5,000 per day may be imposed by the Attorney General if the State has a policy of releasing information that is not in substantial compliance with the DPPA. The State has established that its laws conflict with the DPPA, and that following its own law would likely result in imposition of the fine. Given that approximately 95,000 records are disseminated from over 270 sites across the state each month, the harm that Oklahoma would suffer without an injunction is great. The United States presented no evidence to rebut the testimony of Bill Bruce, and the Court finds that Oklahoma is entitled to an injunction on this basis.

The sole remaining elements are whether the injunction would substantially injure the United States, and whether the public interest would be furthered by the imposition of an injunction. *Tri–State Generation and Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986)(citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980)). In responding to the Application, Defendant does not contradict the State's assertions that the United States will not be injured by the imposition of any injunction. It contends, however, that Oklahoma fails to establish that the public interest will be furthered by imposition of an injunction. Defendant argues that in light of the testimony presented to Congress that murderers and other criminals use motor vehicle records to locate victims, that the public interest will be negatively impacted by imposition of an injunction. The Court finds, however, that the public interest in the sovereignty of the State and in access to records under Oklahoma statute will be served by imposition of an injunction.

### CONCLUSION

For the reasons stated herein, the Court finds that the DPPA violates the Tenth Amendment of the United States Constitution, as it exceeds the scope of Congress' authority. Accordingly, Plaintiff's request for permanent injunctive relief is hereby GRANTED.