**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 3 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

STATE OF OKLAHOMA, ex rel
Oklahoma Department of Public Safety,

    Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA,

    Defendant-Appellant.

No. 97-6389

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-97-1423-R)

---

James Robert Johnson, Assistant Attorney General (Douglas F. Price, Assistant Attorney General, and John K. Lindsey, General Counsel, Oklahoma Department of Public Safety, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Mark B. Stern (Alisa B. Klein and Daniel Kaplan with him on the brief), Appellate Staff, Civil Division, Department of Justice, Washington, D.C. for Defendant-Appellant.

Robin L. Rivett, Anne M. Hawkins, and Deborah J. La Fetra, Of Counsel, Pacific Legal Foundation, Sacramento, California, filed an Amicus Curiae Brief in Support of Plaintiff-Appellee.

Thomas H. Odom, Gregory S. Feder, and Marc R. Baluda of Arter & Hadden LLP, Washington, D.C., Bill Pryor, Attorney General, Billington M. Garrett, Assistant Attorney General, and Jack Curtis, Assistant Attorney General, Montgomery, Alabama, and William U. Hill, Attorney General, Cheyenne, Wyoming, filed an Amicus Curiae Brief in Support of Plaintiff-Appellee.

---

Before **ANDERSON**, **HOLLOWAY**, and **BALDOCK**, Circuit Judges.

_____

**BALDOCK**, Circuit Judge.

_____

In this case, Oklahoma's open record laws and federal legislation preventing

disclosure of information contained in motor vehicle records are in conflict.  The

Oklahoma Highway Safety Code, Okla. Stat. tit. 47, § 6-117(h), and the Oklahoma Open

Records Act, Okla. Stat. tit. 51, § 24A.5, require that information about any individual

identified in the records of Oklahoma's motor vehicle department be available for public

inspection for a small fee.  Any public official who willfully violates the state's open

records policy is subject to both criminal and civil liability.  Id. § 24A.17.  In contrast,

subject to certain enumerated exceptions, the Driver's Privacy Protection Act of 1994

(DPPA), Pub. L. No. 103-322, 108 Stat. 2099-2102 (effective Sept. 13, 1997) (codified at

18 U.S.C. §§ 2721-2725), prohibits a state motor vehicle department from knowingly

disclosing "personal information" about any individual obtained "in connection with a

motor vehicle record."  18 U.S.C. § 2721(a).  The DPPA authorizes the Attorney General

to assess a civil fine of up to $5,000 a day against any state motor vehicle department that

"has a policy or practice of substantial noncompliance" with the DPPA.  Id. § 2723(b).

The DPPA also provides for criminal fines and civil damages against any person who

knowingly violates its provisions.  Id. §§ 2723(a) & 2724.

The state of Oklahoma filed suit challenging the DPPA on its face as an

2

unconstitutional infringement upon state sovereignty. The question presented is whether the DPPA is a valid exercise of congressional power to which contrary state law must yield consistent with constitutional principals of federalism and the Tenth Amendment's reservation to the States of all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X.

I.

To protect the personal privacy and safety of licensed drivers, see 138 Cong. Rec. H1785-01, Congress enacted the DPPA which restricts the ability of third parties to obtain personal information about individuals identified in the records of state motor vehicle departments. The first section of the DPPA provides:

> **(a) In general.**–Except as provided in subsection (b), a State department of motor vehicles, and any officer, employee, or contractor, thereof, shall not knowingly disclose or otherwise make available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record.

18 U.S.C. § 2721(a).[1] Subsection (b) of § 2721 requires a state to disclose personal information in limited situations to carry out the purposes of federal and state laws

---

[1] The DPPA defines "motor vehicle record" as "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles." The DPPA defines "personal information" as that which "identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit zip code), telephone number, and medical or disability information, but does not include information on vehicular accidents, driving violations, and driver's status." 18 U.S.C. § 2725(1) & (3).

3

affecting motor vehicles. Subsection (b) also sets forth fourteen exceptions to subsection (a)'s general prohibition, each of which allow a state motor vehicle department, in its discretion, to disclose personal information in certain instances. Id. § 2721(b). Perhaps the most notable of these is exception eleven, which is an opt-out provision allowing a state to disclose an individual's motor vehicle record–

> if the motor vehicle department has provided in a clear and conspicuous manner on forms for issuance or renewal of operator's permits, titles, registrations, or identification cards, notice that personal information collected by the department may be disclosed to any business or person, and has provided in a clear and conspicuous manner on such forms an opportunity to prohibit such disclosures.

Id. § 2721(b)(11).[2]

In its complaint, the state of Oklahoma sought declaratory and injunctive relief, asking the district court to declare the DPPA unconstitutional and enjoin its enforcement. According to the state, the DPPA impairs the state's ability to manage its motor vehicle records by directing the state to regulate the disclosure of motor vehicle information in a specific manner. The state contends the DPPA unconstitutionally "commandeers" the functioning of its motor vehicle department by requiring the state to regulate a federal program. The United States defends the DPPA on the basis that it does not direct the state to regulate a federal program; rather the DPPA directly regulates the disclosure of

_____

[2] The DPPA also places restrictions on the manner in which third parties may use, sell, or otherwise re-disclose personal information obtained pursuant to the DPPA's exceptions. 18 U.S.C. § 2721(c).

4

state motor vehicle information consistent with constitutional principles of federalism and the Tenth Amendment.

The district court granted the state's requested relief and permanently enjoined the United States from enforcing the DPPA in Oklahoma.  The district court held that the DPPA constituted an unconstitutional "command to state governments to implement legislation enacted by Congress."  Oklahoma v. United States, 994 F. Supp. 1358, 1363 (W.D. Okla. 1997).  The court reasoned:

> The State of Oklahoma processes approximately 1 million requests for motor vehicle information annually . . . .  The system set forth in the DPPA would require Oklahoma to train . . . [Oklahoma Department of Public Safety] employees and the employees in approximately 270 tag agencies across the State on when and how records may be released.  Additionally, the State would be required to monitor the tag agents to ensure their compliance with the federal standards.

Id. at 1362.  According to the district court, the DPPA unlawfully required the state of Oklahoma to create and maintain a system to enforce an unfunded federal mandate.  Id. at 1363.  Our jurisdiction to review the district court's judgment arises under 28 U.S.C. § 1291.  We review de novo the district court's determination of the DPPA's constitutionality, United States v. Bolton, 68 F.3d 396, 398 (10th Cir. 1995), and reverse.

## II.

In determining whether an Act of Congress is constitutional on its face, we afford the legislation great deference.  Rostker v. Goldberg, 453 U.S. 57, 64 (1981).  We begin with the presumption that the challenged statute is constitutional.  INS v. Chadha, 462

5

U.S. 919, 944 (1983). We do not question the wisdom of the statute. Id. "Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end." TVA v. Hill, 437 U.S. 153, 194 (1978).

Ascertaining the constitutional line between federal and state power is among the most difficult judicial tasks. The Constitution confers certain enumerated powers upon Congress. U.S. Const. Art. I. To the extent the Constitution does not divest the states of certain powers, they retain them. Thus, the Tenth Amendment "states but a truism that all is retained which has not been surrendered." United States v. Darby, 312 U.S. 100 124 (1941). To be sure, states retain a significant amount of sovereign authority. See Garcia v. San Antonio Metropolitan Transit Auth., 469 U.S. 528, 549 (1985). How much remains uncertain. We therefore look to existing Supreme Court precedent for guidance as to the proper division between federal and state authority.

## A.

To support its argument that the DPPA is unconstitutional, the state of Oklahoma relies principally on New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 521 U.S. 98 (1997). Both New York and Printz set aside Acts of Congress on Tenth Amendment grounds. The state argues that New York and Printz establish a broad prohibition against federal restrictions aimed exclusively at state activity–a prohibition which, according to the state of Oklahoma, sounds the death knell of the DPPA.

In New York, the Court addressed the constitutionality of the "take title" provision of the Low-Level Radioactive Waste Policy Amendments Act of 1985. That provision directed state legislatures either to enact laws regulating the disposal of low level nuclear waste produced within their borders, or to take title to and possession of such waste with all its accompanying liability and problems. A state's failure to "choose" either alternative would result in the state becoming liable for all damages waste generators suffered as a result of the state's inaction. The Court held that the provision was inconsistent with the division of authority between state and federal governments because it commandeered the states' legislative process by compelling them to enact or administer a federal regulatory program. Id. at 174-177. In other words, the law effectively required states either to legislate pursuant to Congress' direction, or to implement an administrative solution. The Court emphasized that a state could not decline to administer the program. No matter which alternative the state chose, it was compelled to follow Congress' mandate. Id. at 176-77. The Court concluded:

> No matter how powerful the federal interest involved, the Constitution simply does not give Congress the authority to require the States to regulate. The Constitution instead gives Congress the authority to regulate matters directly and to pre-empt contrary state regulation. Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.

Id. at 178 (emphasis added).

Subsequent to New York, the Court again addressed the proper division between state and federal authority in Printz. Printz involved the constitutionality of certain

7

interim provisions of the Brady Handgun Violence Prevention Act. Those provisions directed state and local law enforcement officials to conduct background checks and perform other tasks related to prospective handgun purchasers. Relying on historical practice, the structure of the Constitution, and its prior decisions, a sharply divided Court held that the forced participation of a state's executive officers in the actual administration of a federal program, albeit only temporarily, was unconstitutional. Printz, 521 U.S. at ___ . The Court concluded:

> We held in New York that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. . . . [S]uch commands are fundamentally incompatible with our constitutional system of dual sovereignty.

Id. at ___ .

## B.

The United States asserts that New York and Printz do not prohibit Congress from imposing restrictions directly on state activity; rather they only prohibit Congress from requiring states to enact or administer a federal regulatory program designed to address problems created by third parties. The United States argues that the DPPA is constitutional because it regulates state motor vehicle departments by directing them to comply with federal law. The DPPA does not require states or their agents to regulate third parties by directing states to enforce federal law. Citing South Carolina v. Baker,

8

485 U.S. 505 (1988), the United States suggests the Tenth Amendment poses no bar to federal legislation which regulates state activity directly.

Baker addressed the constitutionality of § 310(b)(1) of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), which removed from federal income tax exemption interest earned on bearer bonds issued by state and local governments. The question was whether § 310(b)(1) violated the Tenth Amendment by compelling states to issue bonds in registered form. Baker, 485 U.S. at 507-08. Treating § 310(b)(1) as if it directly regulated the states by prohibiting the issuance of bearer bonds, the Court rejected South Carolina's argument that the law was invalid because it commandeered the state legislative and administrative process by requiring states to enact legislation authorizing and administering bond registration. Id. at 513. The Court reasoned:

> Such 'commandeering' is . . . an inevitable consequence of regulating a state activity. Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.

Id. at 514-15. With this background in mind, we turn to a discussion of the DPPA.

### III.

Relying on New York and Printz, a divided panel of the Fourth Circuit recently held that because the DPPA was not a "generally applicable law," "Congress did not have authority under our system of dual sovereignty to enact it." Condon v. Reno, 155 F.3d

9

453, 463 (4th Cir. 1998), <u>petition for rehearing filed</u> October 16, 1998.[3]  In <u>Condon</u>, the

Fourth Circuit read <u>Garcia v. San Antonio Metropolitan Transit Auth.</u>, 469 U.S. 528

(1985), and its progeny (including <u>Baker</u>) to stand for the proposition, purportedly

endorsed in <u>New York</u> and <u>Printz</u>, that Congress may only regulate the conduct of state

governments through laws of general applicability.  <u>Condon</u>, 155 F.3d at 461-62 & n.5.[4]

According to the Fourth Circuit, Congress may not regulate "States as States."  Rather,

"Congress may only subject states to legislation that is also applicable to private parties."

<u>Id.</u> at 461 (citing <u>New York</u>, 505 U.S. at 160).  Because the DPPA regulated only the

disclosure of information contained in state motor vehicle records and did not regulate the

disclosure of personal information contained in private databases, the DPPA, like the

laws in <u>New York</u> and <u>Printz</u>, could not withstand Tenth Amendment scrutiny.  <u>Condon</u>

155 F.3d at 460-63.[5]

---

[3]  On October 22, 1998, the Fourth Circuit ordered Plaintiffs Condon and South Carolina to respond to the United States' petition for rehearing with suggestion for rehearing en banc.  Plaintiffs filed their response on November 3, 1998.  As of today's date, the United States' petition remains pending.

[4]  In <u>Garcia</u>, the Court overruled the "traditional governmental functions" test established in <u>National League of Cities v. Usery</u>, 426 U.S. 833 (1976), and held that application of the Fair Labor Standards Act to state and local governments did not unconstitutionally infringe upon state sovereignty.  The Court declined, however, "to identify or define what affirmative limits the constitutional structure might impose on federal action affecting States under the Commerce Clause."  <u>Garcia</u>, 469 U.S. at 556. <u>See also</u> <u>EEOC v. Wyoming</u>, 460 U.S. 226 (1983) (upholding application of the ADEA to the States).

[5]  The question of the DPPA's constitutionality currently is pending in the Seventh
<span style="float:right">(continued...)</span>

10

In his dissent, Judge Phillips rejected the majority's conclusion that Congress lacks any authority to regulate the "States as States." Id. at 469 (Phillips, J., dissenting). According to Judge Phillips, the legislation at issue in Garcia and subsequent cases relied on by the court "was immune to Tenth Amendment challenge not so much–if at all–because it applied equally to state and private actors as because it directly regulated state activities rather than using the 'States as implements of regulation' of third parties." Id. at 468 (quoting New York, 505 U.S. at 160). In regulating states that choose to release motor vehicle information to the public, Congress simply exercised its power of preemption by requiring states to release such information into the stream of commerce in a manner Congress deemed appropriate.

Like Judge Phillips, we do not read Supreme Court precedent as establishing a blanket rule that "Congress may only subject state governments to generally applicable law." Condon, 155 F.3d at 461 (internal quotations omitted). The Supreme Court has never suggested that the Tenth Amendment bars Congress from regulating state conduct merely because states are the only actors engaged in certain activity.

> Surely it is no basis for invalidating [the DPPA] . . . that no private
> equivalent could be found in the particular area of regulation. Would the
> requirements of the DPPA really be any less intrusive on state sovereignty

[5](...continued)
and Eleventh Circuits. Travis v. Reno, 12 F. Supp. 2d 921 (W.D. Wis.) (holding the DPPA unconstitutional), appeal docketed, No. 98-2881 (7th Cir., filed July 27, 1998); Pryor v. Reno, 998 F. Supp.1317 (M.D. Ala.) (holding the DPPA constitutional), appeal docketed, No. 98-6261 (11th Cir., filed April 2, 1998).

interests if they were part of broad privacy protections involving private as well as public holders of sensitive information?

Id. at 469 (Phillips, J., dissenting).

To be sure, the Supreme Court has noted a logical distinction between generally applicable laws, which incidentally apply to states, and laws compelling States to legislate or regulate in accordance with federal law. Printz, 521 U.S. at ___; New York, 505 U.S. at 160. Oppressive federal regulation that "commandeers" a state's sovereign functions is less likely to arise where the law is aimed at both private and public entities. This is so because generally applicable laws are not aimed at uniquely governmental functions. Moreover, laws affecting both private and public interests are subject to stricter political monitoring by the private sector. See Vicki C. Jackson, Federalism and the Uses and Limits of Law: Printz and Principle?, 111 Harv. L. Rev. 2180, 2207 (1998).

The Supreme Court's "anticommandeering" approach in New York and Printz reflects a legitimate concern about federal government interference with state government functions. But the arguments against the DPPA are much less compelling than the arguments against the statutes at issue in New York and Printz. Unlike the federal statute in New York, the DPPA does not commandeer the state legislative process by requiring states to enact legislation regulating the disclosure of personal information from motor vehicle records. Rather, the DPPA directly regulates the disclosure of such information and preempts contrary state law. See New York, 505 U.S. at 178. If states do not wish to comply with those regulations, they may stop disseminating information in their motor

12

vehicle records to the public.  In contrast, the statute in New York offered no such alternative to the states.

Unlike the federal statute in Printz, the DPPA does not conscript state officials to enforce federal law.  Under the DPPA, enforcement is the job of federal officials.  Unlike New York and Printz, the DPPA does not affect any unique government function, such as the state legislative process or state law enforcement activities.  The dissemination of personal information into the stream of commerce can in no sense be considered uniquely governmental.  See e.g., Fair Credit Reporting Act, 15 U.S.C. § 1681b; Video Privacy Protection Act, 18 U.S.C. § 2710.  The DPPA neither limits a state's ability to regulate in the field of automobile licensing and registration, an exercise traditionally left to the states, nor restricts a state's ability to use motor vehicle information in its own regulatory activities.

Our conclusion that the DPPA differs from the statutes at issue in New York and Printz is buttressed by the Supreme Court's decision in Baker.  The only provision of TEFRA at issue in Baker was § 310(b)(1), which removed the federal tax exempt status for bearer bonds issued by state and local entities.  Consequently, the provision imposed a burden only on state and local governments.  In upholding § 310(b)(1), Baker rejected the notion that the federal government may never force a state wishing to engage in certain activity to take administrative or legislative actions to comply with federal standards.  485 U.S. at 514-15.  In fact, the Court referred to federal regulation of state activity as "a

13

commonplace that presents no constitutional defect." Id. at 515.

In enacting the DPPA, Congress obviously curtailed states' prerogative to make choices respecting the release of motor vehicle information. No one claims that Congress exceeded the scope of its power under the Commerce Clause in so doing. Nor has the Supreme Court ever suggested that Congress impermissibly invades areas reserved to the states under the Tenth Amendment because it exercises its preemptive authority under the Commerce Clause in a manner that displaces state law and policy to some extent. The DPPA simply requires states to make a choice, i.e. stop releasing personal information from state motor vehicle records to the public, or release such information consistent with the dictates of the DPPA. See FERC v. Mississippi, 456 U.S. 742, 767-68 n.30 (1982) (upholding federal legislation that gave States "a choice between regulating in conformity with federal requirements, or abandoning regulation in a given field").

While we are cognizant of the Supreme Court's trend established by New York and Printz of striking down federal legislation which "commandeers" state legislative and administrative processes, the Court has yet to hold that a federal law, which directly regulates state activity and necessitates some state legislative or administrative action to achieve compliance, amounts to unconstitutional "commandeering." If a precedent of the Supreme Court (in this case Baker) "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case that directly controls, leaving to . . . [the Supreme Court] the prerogative of

14

overruling its own decisions." <u>Rodriguez de Quijas v. Shearson/American Express, Inc.</u>, 490 U.S. 477, 484 (1989). Finding the logic in <u>Baker</u> controlling, we believe that any expansion of Tenth Amendment jurisprudence to invalidate the DPPA is best left to the Supreme Court. At this stage in Tenth Amendment jurisprudence, we find nothing that requires us to invalidate the DPPA. We hold that the DPPA constitutes a valid exercise of congressional power.[6] The judgment of the district court is

REVERSED.

---

[6] Because we conclude that the DPPA does not violate the Tenth Amendment, we need not address the United States' alternative argument that the DPPA may also be upheld as a legitimate exercise of congressional power under § 5 of the Fourteenth Amendment.