Reversed by Supreme Court on January 12, 2000.

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 97-2554
(CA-96-3476-3-19)

Charlie Condon, etc., et al,

Plaintiffs - Appellees,

versus

Janet Reno, etc., et al,

Defendants - Appellants.

O R D E R

The court amends its opinion filed September 3, 1998, as follows:

On the cover sheet, section 2 -- the first amicus curiae is corrected to read "Better Government Bureau."

On page 27, second full paragraph, line 2 -- the comma after "States as States" is deleted.

On page 28, first paragraph, line 2 -- the comma after U.S. in "426 U.S. 833" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARLIE CONDON, Attorney General
for the State of South Carolina;
STATE OF SOUTH CAROLINA,
<u>Plaintiffs-Appellees,</u>

and

SOUTH CAROLINA PRESS ASSOCIATION;
VIRGINIA PRESS ASSOCIATION; NORTH
CAROLINA PRESS ASSOCIATION; WEST
VIRGINIA PRESS ASSOCIATION;
MARYLAND/DELAWARE/DISTRICT OF
COLUMBIA PRESS ASSOCIATION; THE
NEWSPAPER ASSOCIATION OF AMERICA;
AMERICAN SOCIETY OF NEWSPAPER

EDITORS,
<u>Intervenors-Plaintiffs,</u>

v.

JANET RENO, Attorney General of
the United States; UNITED STATES  OF
AMERICA,
<u>Defendants-Appellants.</u>

BETTER GOVERNMENT BUREAU,
INCORPORATED; STATE OF ALABAMA;
STATE OF OKLAHOMA; STATE OF
IDAHO,
<u>Amici Curiae.</u>

No. 97-2554

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Dennis W. Shedd, District Judge.
(CA-96-3476-3-19)

Argued: June 2, 1998

Decided: September 3, 1998

Before HAMILTON and WILLIAMS, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Williams wrote the majority
opinion, in which Judge Hamilton joined. Senior Judge Phillips wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Mark Bernard Stern, Appellate Staff, Civil Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellants. Kenneth Paul Woodington, Senior Assistant
Attorney General, Columbia, South Carolina, for Appellees. Thomas
Henry Odom, II, ARTER & HADDEN, L.L.P., Washington, D.C., for
Amici Curiae. **ON BRIEF:** Frank W. Hunger, Assistant Attorney
General, J. Rene Josey, United States Attorney, Stephen W. Preston,
Deputy Assistant Attorney General, Alisa B. Klein, Daniel Kaplan,
Appellate Staff, Civil Division, UNITED STATES DEPARTMENT
OF JUSTICE, Washington, D.C., for Appellants. Charles Molony
Condon, Attorney General, Treva Ashworth, Deputy Attorney Gen-
eral, Columbia, South Carolina, for Appellees. Gregory S. Feder,
Marc R. Baluda, ARTER & HADDEN, L.L.P., Washington, D.C.;
Bill Pryor, Attorney General, Billington M. Garrett, Assistant Attor-
ney General, STATE OF ALABAMA, Montgomery, Alabama; Jack
Curtis, Assistant Attorney General, DEPARTMENT OF PUBLIC
SAFETY, Montgomery, Alabama; W.A. Drew Edmondston, Attorney
General, James R. Johnson, Assistant Attorney General, Douglas F.
Price, Assistant Attorney General, STATE OF OKLAHOMA, Okla-
homa City, Oklahoma; John K. Lindsey, General Counsel, DEPART-
MENT OF PUBLIC SAFETY, Oklahoma City, Oklahoma; Alan G.
Lance, Attorney General, STATE OF IDAHO, Boise, Idaho, for
Amici Curiae.

_____

**OPINION**

WILLIAMS, Circuit Judge:

The Attorney General of the State of South Carolina (the State) challenged the constitutionality of the Driver's Privacy Protection Act (DPPA), see 18 U.S.C.A. §§ 2721-2725 (West Supp. 1998), in the United States District Court for the District of South Carolina on the grounds that it violated the Tenth and Eleventh Amendments to the United States Constitution.**1** The United States defended the DPPA, arguing that it was lawfully enacted pursuant to Congress's powers under both the Commerce Clause and Section 5 of the Fourteenth Amendment. After reviewing the parties' arguments, the district court held that the DPPA violated the Tenth Amendment and permanently enjoined its enforcement in the State of South Carolina. See Condon v. Reno, 972 F. Supp. 977, 979 (D.S.C. 1997).

On appeal, the United States first contends that the DPPA was lawfully enacted pursuant to Congress's power under the Commerce Clause. Although Congress may regulate entities engaged in interstate commerce, Congress is constrained in the exercise of that power by the Tenth Amendment. As a result, when exercising its Commerce Clause power, Congress may only "subject state governments to generally applicable laws." New York v. United States, 505 U.S. 144, 160 (1992). The DPPA exclusively regulates the disclosure of personal information contained in state motor vehicle records. Thus, rather than enacting a law of general applicability that incidentally applies to the States, Congress passed a law that, for all intents and purposes,

_____

**1** In addition to the State's claims, several media organizations (Intervenors), challenged the constitutionality of the DPPA on the grounds that it violated the First Amendment. Because the district court found that the DPPA violated the Tenth Amendment, it had no reason to address the constitutionality of the Act under either the Eleventh Amendment or the First Amendment. See Condon v. Reno, 972 F. Supp. 977, 979 n.3 (D.S.C. 1997). Although neither party raised the Eleventh Amendment issue before this Court, Intervenors moved this Court for leave to file an amicus brief to argue that the DPPA violated the First Amendment. Because that issue was not considered by the district court, Intervenors' motion was denied.

3

applies only to the States. Accordingly, the DPPA is simply not a valid exercise of Congress's Commerce Clause power.

In the alternative, the United States contends that the DPPA was lawfully enacted pursuant to Congress's power under Section 5 of the Fourteenth Amendment. When enacting legislation under Section 5 of the Fourteenth Amendment, however, Congress's power "extends only to enforc[ing] the provisions of the Fourteenth Amendment." City of Boerne v. Flores, 117 S. Ct. 2157, 2164 (1997) (emphasis added). The United States asserts that individuals possess a Fourteenth Amendment right to privacy in their names, addresses, and phone numbers, and that the DPPA enforces that constitutional right. Neither the Supreme Court nor this Court, however, has ever recognized a constitutional right to privacy with respect to such information. Congress is granted a remedial power under Section 5 of the Fourteenth Amendment, not a substantive power. As a consequence, the DPPA is not a valid exercise of Congress's Enforcement Clause power.

Under our system of dual sovereignty, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Because Congress lacked the authority to enact the DPPA under either the Commerce Clause or Section 5 of the Fourteenth Amendment, we affirm the judgment of the district court.

I.

As recited by the district court, the pertinent facts are as follows:

> Congress enacted the DPPA in 1994 in an effort to remedy what it perceived to be a problem of national concern: i.e., the active commerce in, and consequent easy availability of, personal information contained in State motor vehicle records. Testimony before Congress established that as many as 34 States allowed easy access to personal information contained in motor vehicle records and that criminals had used such information to locate victims and commit crimes. Congress also found that many States sell or other-

4

wise permit the use of information contained in motor vehicle records for direct marketing purposes.

The DPPA, which [was] scheduled to become effective on September 13, 1997, generally prohibits "a State department of motor vehicles, and any officer, employee, or contractor, thereof, [from] knowingly disclos[ing] or otherwise mak[ing] available to any person or entity personal information about any individual obtained by the department in connection with a motor vehicle record." 18 U.S.C.§ 2721(a). The DPPA specifies a list of exceptions when personal information contained in a State motor vehicle record may be obtained and used. See 18 U.S.C. § 2721(b). Additionally, the DPPA permits State motor vehicle departments to:

[E]stablish and carry out procedures under which the department or its agents, upon receiving a request for personal information that does not fall within one of the exceptions in [§ 2721(b)], may mail a copy of the request to the individual about whom the information was requested, informing such individual of the request, together with a statement to the effect that the information will not be released unless the individual waives such individual's right to privacy under [§ 2721].

18 U.S.C. § 2721(d). The DPPA also prohibits"any person [from] knowingly . . . obtain[ing] or disclos[ing] personal information, from a motor vehicle record, for any use not permitted under section 2721(b)," 18 U.S.C. § 2722(a), and from "mak[ing] false representation to obtain any personal information from an individual's motor vehicle record." 18 U.S.C. § 2722(b).

The DPPA provides that "[a]ny State department of motor vehicles that has a policy or practice of substantial noncompliance . . . shall be subject to a civil penalty imposed by the Attorney General of not more than $5,000 a day for each day of substantial noncompliance." 18 U.S.C.§ 2723(b). The DPPA also creates a criminal fine, 18 U.S.C.§ 2723(a),

5

> and a civil cause of action against a "person" who knowingly violates it. 18 U.S.C. § 2724(a).
>
> South Carolina currently has its own statutory provisions regarding the disclosure and use of its motor vehicle records, and South Carolina's scheme differs significantly from the DPPA. See S.C. Code Ann. §§ 56-3-510 to -540. Under South Carolina law a person who requests information contained in South Carolina's motor vehicle records must submit the request on a form provided by the State Department of Public Safety ("the Department") and must specify, inter alia, his or her name and the reason for the request, and must certify that the information will not be used for the purpose of telephone marketing or solicitation. S.C. Code Ann. § 56-3-510. The Department must retain all requests for motor vehicle record information for five years and must release a copy of all requests relating to a person upon that person's written request. S.C. Code Ann. § 56-3-520. The Department is authorized to charge a fee for releasing motor vehicle record information, and is required to promulgate certain procedural regulations relating to the release of motor vehicle record information, S.C. Code Ann. § 56-3-530, and to implement procedures to ensure that persons may "opt-out" and prohibit the use of motor vehicle record information about them for various commercial activities. S.C. Code Ann. § 56-3-540. The undisputed evidence submitted establishes that implementation of the DPPA would impose substantial costs and effort on the part of the Department in order for it to achieve compliance.

Condon v. Reno, 972 F. Supp. 977, 979-81 (D.S.C. 1997) (footnotes omitted) (all but first alteration in original).

In addition to challenging the constitutionality of the DPPA, the State sought a permanent injunction prohibiting enforcement of the DPPA. The United States filed a motion to dismiss the suit based upon its contention that the DPPA was lawfully enacted pursuant to Congress's powers under both the Commerce Clause and Section 5 of the Fourteenth Amendment. In response, the State moved for summary judgment in its favor. After reviewing the parties' motions, the

6

district court concluded that the DPPA was unconstitutional. Accordingly, the district court denied the United States' motion to dismiss, granted the State's motion for summary judgment, and permanently enjoined the enforcement of the DPPA in the State of South Carolina. This appeal followed.

II.

In this case, we must determine whether the DPPA violates the Tenth Amendment. Like all Acts of Congress, the DPPA is "presumed to be a constitutional exercise of legislative power until the contrary is clearly established." Close v. Glenwood Cemetery, 107 U.S. 466, 475 (1883); see also I.N.S. v. Chadha , 462 U.S. 919, 944 (1983) ("We begin, of course, with the presumption that the challenged statute is valid."). Whether the contrary has been clearly established in this case, as the district court found, is a legal question subject to de novo review. See Plyler v. Moore, 129 F.3d 728, 734 (4th Cir. 1997).

The Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. When, however, Congress "is acting within the powers granted it under the Constitution, [it] may impose its will on the States." Gregory v. Ashcroft, 501 U.S. 452, 460 (1991). On appeal, the United States contends that the DPPA was lawfully enacted pursuant to Congress's powers under both the Commerce Clause and Section 5 of the Fourteenth Amendment. We address these arguments in turn.

A.

The United States first contends that the DPPA is constitutional because Congress enacted it pursuant to its power under the Commerce Clause. Congress, however, is constrained in the exercise of that power by the Tenth Amendment. Thus, the question before this Court is not whether the DPPA regulates commerce, but whether it is consistent with the system of dual sovereignty established by the Constitution.

7

1.

When Congress exercises its Commerce Clause power against the States, the resulting enactment is analyzed by the Supreme Court under one of two different lines of cases. See New York v. United States, 505 U.S. 144, 160-61 (1992) (recognizing the two distinct lines of cases); see also West v. Anne Arundel County, Md., 137 F.3d 752, 759-60 (4th Cir. 1998) (same). The first line of cases concerns the authority of Congress to regulate the States as States. See, e.g., Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985). Under this line of cases, Congress may enact laws of general applicability that incidentally apply to state governments. The second line of cases concerns the authority of Congress to direct the States to implement or administer a federal regulatory scheme. See, e.g., Printz v. United States, 117 S. Ct. 2365 (1997). Under this line of cases, Congress may not enact any law that would direct the functioning of the States' executives or legislatures. Not surprisingly, the United States contends that the instant case falls under the first line, while the State argues (and the district court found) that the case is controlled by the latter line of cases.

a.

The Supreme Court's jurisprudence with respect to the first line of cases has not been a model of consistency. In Maryland v. Wirtz, 392 U.S. 183 (1968), the Supreme Court first held that Congress could subject state governments to generally applicable laws, such as the Fair Labor Standards Act. In National League of Cities v. Usery, 426 U.S. 833 (1976), the Supreme Court overruled Wirtz. In particular, the Court held that the Commerce Clause did not give Congress the authority to regulate the "States as States." Id. at 845 (holding that state employees are not subject to the Fair Labor Standards Act). In other words, Congress could "not exercise [Commerce Clause] power so as to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made." Id. at 855.**2**

_____

**2** Without question, "the licensing of drivers constitutes an integral portion of those governmental services which the States and their political

8

The Supreme Court subsequently overruled National League of Cities in Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985). In Garcia, the Supreme Court decided to leave to the political process the protection of the States against intrusive exercises of Congress's Commerce Clause powers.**3** Id. at 547-56. Thus, under Garcia and its progeny, Congress may once again subject the States to legislation that is also applicable to private parties. See id. (upholding application of the FLSA to state and local governments because it was a generally applicable law); EEOC v. Wyoming, 460 U.S. 226 (1983) (upholding application of the ADEA to state and local governments because it was a generally applicable law); South Carolina v. Baker, 485 U.S. 505 (1988) (upholding application of the Tax Equity and Fiscal Responsibility Act of 1982 to state and local governments because it was a generally applicable law); see also Printz, 117 S. Ct. at 2383 (noting that under Garcia "the incidental application to the States of a federal law of general applicability" was lawful); New York, 505 U.S. at 160 (noting that under Garcia and its progeny, Con-

_____

subdivisions have traditionally afforded their citizens." United States v. Best, 573 F.2d 1095, 1103 (9th Cir. 1978) (internal quotation marks omitted); see also Peel v. Florida Dep't of Transp., 600 F.2d 1070, 1083 (5th Cir. 1979) ("Overseeing the transportation system of the state has traditionally been one of the functions of state government, and thus appears to be within the activities protected by the tenth amendment."). Thus, under the National League of Cities regime, the DPPA clearly would be unconstitutional.

**3** In his dissenting opinion, then Justice Rehnquist expressed his desire to eventually return to the rule outlined in National League of Cities. See Garcia, 469 U.S. at 580 (stating that the principle outlined in National League of Cities "will, I am confident, in time again command the support of a majority of this Court"). Until that time, however, we remain bound by the Supreme Court's decision in Garcia . See, e.g., Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989) (stating that "the Court of Appeals should . . . leav[e] to this Court the prerogative of overruling its own decisions"); West v. Anne Arundel County, Md., 137 F.3d 752, 760 (4th Cir. 1998) (noting that "[l]ower federal courts have repeatedly been warned about the impropriety of preemptively overturning Supreme Court precedent").

gress may only "subject state governments to generally applicable laws").**4**

b.

In contrast, the Supreme Court's jurisprudence with respect to the second line of cases has been a model of consistency. In New York v. United States, 505 U.S. 144 (1992), the Supreme Court reviewed a federal statute that, among other things, required the individual States either to enact legislation regulating low-level radioactive waste generated within their borders or to take title to the waste. As an initial matter, the Supreme Court noted that this was not a simple case of Congress attempting to regulate the States, which would fall under the Garcia line of cases. See id. at 160. Rather, the Supreme Court framed the issue as concerning "the circumstances under which Congress may use the States as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." Id. at 161. In answering that question in the negative, the Supreme Court held that Congress could not "commandeer[ ] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." Id. at 176 (internal quotation marks omitted).

In Printz v. United States, 117 S. Ct. 2365 (1997), the Court reviewed an act of Congress, popularly referred to as the "Brady Bill," which regulated the sale of handguns. The Brady Bill, among other things, required state law enforcement officers"to participate, albeit only temporarily, in the administration of [the] federally enacted regu-

_____

**4** Of course, Congress may only subject the States to such legislation if it expresses with unmistakable clarity an intent to do so. See Pennsylvania Dep't of Corrections v. Yeskey, 118 S. Ct. 1952, 1954 (1998) (finding that Congress plainly stated its intention to apply the ADA to State prisons and prisoners); Gregory v. Ashcroft, 501 U.S. 452, 460 (1991) (finding that the ADEA did not apply to a state constitutional provision requiring judges to retire at age seventy; the Court will not interpret a federal statute in a manner that would interfere with essential state or local functions unless Congress plainly states its intention to do so in the statute itself). It is undisputed that Congress plainly stated its intention to subject the States to the DPPA.

10

latory scheme." Id. at 2369. As in New York, the Supreme Court found that the Garcia line of cases was inapplicable to the question before the Court. See id. at 2383 (application of the Garcia line of cases is inappropriate "where, as here, it is the whole object of the law to direct the functioning of the state executive"). Instead, the Supreme Court framed the issue as the constitutionality of "the forced participation of the States' executive[s] in the actual administration of a federal program." Id. at 2376. Noting that in New York it had held "that Congress cannot compel the States to enact or enforce a federal regulatory program," the Supreme Court in Printz held "that Congress cannot circumvent that prohibition by conscripting the State's officers directly." Id. at 2384. The Court went on to note that

> [t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.

Id.

2.

On appeal, the United States relies primarily upon Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985), and its progeny, while the State relies principally upon New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 117 S. Ct. 2365 (1997). The district court rejected the United States' argument and analyzed the constitutionality of the DPPA under the New York/Printz line of cases. See Condon v. Reno, 972 F. Supp. 977, 985 (D.S.C. 1997); see also Travis v. Reno, No. 97-C-701-C, 1998 WL 307747, *7 (W.D. Wis. June 9, 1998) (finding the DPPA unconstitutional under New York/Printz line of cases); Oklahoma v. United States, 994 F. Supp. 1358, 1363 (W.D. Okla. 1997) (finding the DPPA unconstitutional under New York/Printz line of cases). But see Pryor v. Reno, 998 F. Supp. 1317, 1326-31 (M.D. Ala. 1998) (finding that the DPPA does

11

not compel the states to regulate and, therefore, is constitutional under New York and Printz).

We recognize, as the United States argues, that the DPPA is different in several respects from the statutes struck down in New York and Printz. Unlike the federal statute in New York, the DPPA does not commandeer the state legislative process. In particular, the DPPA does not require the States to enact legislation regulating the disclosure of personal information contained in their motor vehicle records. Instead, Congress enacted the regulations limiting the dissemination of information from those records. Moreover, unlike the federal statute in Printz, the DPPA does not conscript state officers to enforce the regulations established by Congress. Indeed, the DPPA does not require that state officials report or arrest violators of the DPPA. Instead, the DPPA is enforced through civil penalties imposed by the United States Attorney General against the States and permits criminal fines and civil causes of action against individuals.

Nevertheless, state officials must, as the district court found, administer the DPPA. See Condon, 972 F. Supp. at 985-86. The Supreme Court, in both New York and Printz, has made it perfectly clear that the Federal Government may not require State officials to administer a federal regulatory program. See Printz, 117 S. Ct. at 2384 (holding that "[t]he Federal Government may [not] issue directives requiring the States to . . . administer or enforce a federal regulatory program"); New York, 505 U.S. at 176 (holding that the Federal Government cannot compel the States to administer "a federal regulatory program"). Indeed, allowing the Federal Government to do so would be plainly incompatible with our system of "dual sovereignty." Gregory v. Ashcroft, 501 U.S. 452, 457 (1991); see also Tafflin v. Levitt, 493 U.S. 455, 458 (1990).

The United States attempts to sidestep this problem, however, by contending that the holdings in Printz and New York apply only when the law in question requires a State to regulate the behavior of its citizens. Rather than requiring a State to regulate its citizens, the United States contends that the DPPA requires a State to regulate its own behavior. Because the DPPA simply regulates a state activity, i.e., the disclosure of personal information contained in state motor vehicle

12

records, the United States contends that the instant case is controlled by the National League of Cities/Garcia line of cases.

Even assuming that the United States' narrow reading of Printz and New York is correct, analyzing the constitutionality of the DPPA under the Garcia line of cases will not salvage the statute. Under Garcia and its progeny, Congress may only "subject state governments to generally applicable laws." New York, 505 U.S. at 160 (explaining the difference between the two lines of cases); see also Printz, 117 S. Ct. at 2383 (noting that under Garcia "the incidental application to the States of a federal law of general applicability" was lawful). In other words, Congress may only subject the States to legislation that is also applicable to private parties. See New York, 505 U.S. at 160 (noting that under Garcia, Congress may only "subject[ ] a State to the same legislation applicable to private parties").

In Garcia, the Supreme Court upheld application of the Fair Labor Standards Act (FLSA) to state and local governments because the FLSA was generally applicable. Thus, Congress was only allowed to regulate how much the States pay their hourly employees because Congress also regulates how much private parties pay their hourly employees. See Garcia, 469 U.S. at 528 (noting that the FLSA is generally applicable); see also EEOC v. Wyoming, 460 U.S. 226 (1983) (same with the ADEA); South Carolina v. Baker, 485 U.S. 505 (1988) (same with the Tax Equity and Fiscal Responsibility Act of 1982).**5** Here, the DPPA does not attempt to regulate the disclosure of

_____

**5** The dissent argues that the statutes at issue in Garcia and Wyoming were upheld because they did not use the States as implements of regulation, and not because they were generally applicable. See post at 25-26. We disagree. In New York v. United States, 505 U.S. 144 (1992), the Supreme Court cited both decisions as examples of cases dealing with "the authority of Congress to subject state governments to generally applicable laws." Id. at 160. Indeed, the Court specifically stated that under the Garcia line of cases, Congress may only "subject[ ] a State to the same legislation applicable to private parties." Id. This understanding of Garcia and its progeny was recently reaffirmed in Printz v. United States, 117 S. Ct. 2365, 2383 (1997) (noting that the statutes at issue in Garcia and Wyoming were upheld because they were generally applicable). The dissent's complaint, therefore, is not with our characterization

13

personal information contained in all public and private databases, which would incidentally apply to state motor vehicle records. Rather, the DPPA exclusively regulates the disclosure of information contained in state motor vehicle records. Of course, there is no private counterpart to a state Department of Motor Vehicles. Private parties simply do not issue drivers' licenses or prohibit the use of unregistered motor vehicles. Thus, rather than enacting a law of general applicability that incidentally applies to the States, Congress enacted a law that, for all intents and purposes, applies only to the States. See Travis, 1998 WL 307747, *9 ("To state the obvious, the [DPPA] is not a law of general applicability."); Oklahoma v. United States, 994 F. Supp. at 1362 (noting that a "cursory review of the [DPPA] indicates that it is directed at States"); Condon, 972 F. Supp. at 985-86 ("[I]nstead of bringing the States within the scope of an otherwise generally applicable law, Congress passed the DPPA specifically to regulate the States' control of their property.").

Although recognizing that the DPPA does not regulate private parties, the Government nevertheless argues that the DPPA is constitutional under the Garcia line of cases. For instance, the United States contends that the DPPA is constitutional because it "subject[s] the States to the same type of regulation to which a private party could

_____

of the Garcia line of cases, but with the Supreme Court's. Cf. New York, 505 U.S. at 201 (White, J., dissenting) (arguing that the statutes in Garcia and Wyoming were not upheld because they were generally applicable). Although the dissent may question the Supreme Court's analysis in New York and Printz, it is bound to follow it.

Finally, while conceding that the statutes at issue in Garcia and Wyoming were generally applicable, the dissent contends that the statute "at issue in Baker was not one of general applicability." Post at 25 n.3. Again, we disagree. The tax statute in South Carolina v. Baker applied to any entity, whether it be a State or a private party, that issued bonds. See 485 U.S. at 510 (noting that the statute "covers not only state bonds but also bonds issued by the United States and private corporations"). Thus, the law was one of general applicability. Indeed, the Supreme Court in both New York and Printz expressly distinguished the federal tax statute at issue in Baker from the statutes at issue in those cases on the ground that the statute in Baker was one of general applicability. See Printz, 117 S. Ct. at 2383; New York, 505 U.S. at 160.

14

be subjected." Appellant's Br. at 20 (emphasis added). Not surprisingly, the United States failed to provide even a single authority to support this proposition. Under Garcia, a statute is constitutional only if it is generally applicable. A law is not generally applicable simply because it could be generally applicable. That Congress could subject private parties to the same type of regulation is irrelevant to the Tenth Amendment. Congress may invade the sovereignty of the States only when it actually enacts a law of general applicability. Nothing short of that will pass constitutional muster.

The United States also contends that the DPPA is constitutional under Garcia because Congress has already restricted private parties from disclosing personal information in several statutes. In particular, the United States cites the Video Privacy Protection Act, see 18 U.S.C.A. § 2710 (West Supp. 1998) (restricting disclosure of personal information contained in video rental records); the Cable Communications Policy Act, see 47 U.S.C.A. § 551 (West 1991 & Supp. 1998) (restricting disclosure of personal information about cable subscribers); and the Fair Credit Reporting Act, see 15 U.S.C.A. § 1618b (West 1998 & Supp. 1998) (restricting disclosure of credit reports). Although Congress has regulated the disclosure of personal information by some private parties, the Constitution permits Congress to regulate the conduct of individuals. In contrast, Congress may not, as a general matter, regulate the conduct of the States. See New York, 505 U.S. at 166 ("[T]he Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." (quoted with approval in Printz, 117 S. Ct. at 2377)). The one exception, of course, is that Congress may regulate the conduct of the States through laws of general applicability. Thus, that Congress has "regulate[d] the disclosure of information gathered by a variety of private entities," Appellant's Br. at 12 (emphasis added), does not mean that Congress may regulate the disclosure of information gathered by the States absent a generally applicable law.

During oral argument, the United States suggested, for the first time, that the DPPA is generally applicable when considered together with the aforementioned statutes regulating private parties. According to the United States, Congress may enact a statute regulating the States if it has already enacted a statute regulating the same conduct by private parties. Even if the general applicability of the DPPA could

15

be determined in this manner, which we doubt, Congress has simply not enacted a statute regulating the same conduct by private parties. To be sure, Congress has regulated the disclosure of personal information gathered by video stores, cable providers, and credit bureaus. The regulation of these three entities, however, does not provide Congress with a basis for regulating the States. Indeed, we seriously doubt that the Supreme Court would have applied either the FLSA or the ADEA to the States had Congress applied those Acts only to video stores, cable providers, and credit bureaus. It bears repeating that Congress may regulate the conduct of the States only through laws of general applicability. At best, Congress has enacted several laws of limited applicability. Thus, even if the general applicability of a statute could be determined in the manner urged upon us by the United States, Congress has not yet enacted a statute regulating the disclosure of personal information by all private parties.

Because the DPPA is not generally applicable, like the FLSA or ADEA, Congress did not have authority under our system of dual sovereignty to enact it.**6**
(Text continued on page 18)

_____

**6** The dissent contends that the DPPA is constitutional because Congress could have "preempted the field of motor vehicle information disclosure." Post at 23, 26-27. We disagree. Only "where Congress has the authority to regulate private activity under the Commerce Clause . . . [may it] offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." New York v. United States, 505 U.S. 144, 167 (1992) (emphasis added) (citing Hodel v. Virginia Surfacing Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 288 (1981)). Unlike the statutes at issue in the cases cited by the dissent, see Hodel, 452 U.S. at 288 (preemption of state laws regulating surface mining); Gade v. National Solid Waste Management Ass'n, 505 U.S. 88 (1992) (preemption of state laws regulating occupational safety); Department of Energy v. Ohio, 503 U.S. 607 (1992) (preemption of state laws regulating water pollution); FERC v. Mississippi 456 U.S. 742 (preemption of state laws regulating electric and gas utilities), the DPPA, by its own terms, does not regulate private activity. Moreover, even assuming that Congress could have preempted the field of personal information disclosure, it did not do so here. Rather, Congress chose to regulate the States directly.

Similarly, the dissent contends that the DPPA is constitutional because "in exercise of its Commerce Clause powers, Congress could have, had

16

it desired, made receipt of federal highway funds contingent on accepting [the] DPPA's provisions." Post at 23. As an initial matter, we note that Congress may attach conditions on the receipt of federal funds pursuant to its power under the Spending Clause, not the Commerce Clause. See South Dakota v. Dole, 483 U.S. 203 (1987) (holding that Congress has power under the Spending Clause to condition highway funds on States' adoption of minimum drinking age). With that having been said, we question whether Congress could have conditioned the States' receipt of federal highway funds on compliance with the DPPA. It is well established that the statute must bear at least some relationship to the purpose of the federal spending. See id. at 207-08 & n.3. We are hard pressed to see a connection between a privacy statute and highway funds. In any event, even if Congress could have conditioned the States' receipt of federal highway funds on compliance with the DPPA, it did not do so here. As such, that Congress could have done so is of absolutely no import. Indeed, the Supreme Court in New York and Printz held that the statutes at issue in those cases were unconstitutional even though it specifically recognized that both statutes could have been lawfully passed pursuant to Congress's Spending Clause power. See Printz , 117 S. Ct. at 2385 (O'Connor, J., concurring) (noting that Congress could have conditioned the States' receipt of federal funds on compliance with the statute); New York, 505 U.S. at 167 (noting that Congress could have enacted the statute under its Spending Clause power).

Finally, the dissent argues that the DPPA is no different than the "National Voter Registration Act," which was upheld against a Tenth Amendment challenge in Association of Community Orgs. for Reform Now (ACORN) v. Edgar, 56 F.3d 791 (7th Cir. 1995). See post at 28-29. Again, we disagree. The statute at issue in ACORN, popularly known as the "motor voter" law, was designed to make it easier to register to vote in federal elections. The Constitution, however, specifically grants Congress the power to regulate the time, place, and manner of congressional elections. See U.S. Const. art. I, § 4, cl. 1. Because the "manner" of holding elections includes the system for registering voters, see Smiley v. Holm, 285 U.S. 355, 366 (1932), the Seventh Circuit upheld the statute against a Tenth Amendment challenge, see ACORN, 56 F.3d at 793-94. We cannot find, and the dissent does not cite, a similar provision in the Constitution that specifically grants Congress the power to regulate the dissemination of personal information. As such, Congress's adoption of the motor voter law tells us nothing about the constitutionality of the

17

B.

The United States also contends that the DPPA was properly enacted pursuant to Congress's power under Section 5 of the Fourteenth Amendment. In light of the Supreme Court's landmark decision in City of Boerne v. Flores, 117 S. Ct. 2157 (1997), we are constrained to disagree.[7]

The Fourteenth Amendment provides, in pertinent part, as follows:

> Section 1. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any persons within its jurisdiction the equal protection of the laws.
>
> . . . .
>
> Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV, §§ 1, 5. Section 5 "is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." Katzenbach v. Morgan, 384 U.S. 641, 651 (1966). In fact, "when properly exercising its power under § 5, Congress is not limited by the same Tenth Amendment constraints that circumscribe the exercise of its Commerce Clause powers." EEOC v. Wyoming, 460 U.S. at 243 n.18 (emphasis added) (citing City of Rome v. United States, 446 U.S. 156, 179 (1980)). Congress's power to enact legislation under the Fourteenth Amendment is not unlimited, however. See, e.g., City of Boerne v. Flores, 117 S. Ct. 2157, 2171 (1997) (holding that the Religious Free-

_____

DPPA.

**7** Although the Supreme Court's ground breaking decision in City of Boerne v. Flores, 117 S. Ct. 2157 (1997), was decided in June of 1997, the United States did not cite the case in its opening brief, which was filed in January of 1998.

18

dom Restoration Act is "a considerable congressional intrusion into the States' traditional prerogatives," and that Congress exceeded its power under the Fourteenth Amendment in enacting the statute); Gregory v. Ashcroft, 501 U.S. 452, 469 (1991) (stating that "the Fourteenth Amendment does not override all principles of federalism"); Oregon v. Mitchell, 400 U.S. 112, 128 (1970) (noting that "[a]s broad as the congressional enforcement power is, it is not unlimited"). For instance, Congress's power "extends only to enforc[ing] the provisions of the Fourteenth Amendment." City of Boerne, 117 S. Ct. at 2164 (emphasis added) (internal quotation marks omitted). Of perhaps equal importance, it is only a preventative or remedial power, not a substantive power. See id. at 2167. As a result, Congress does not possess "the power to determine what constitutes a constitutional violation." Id. at 2164.

Whether Congress properly exercised its power under Section 5 when it enacted the DPPA turns, therefore, on whether the Act enforces some right guaranteed by the Fourteenth Amendment. The United States contends "that automobile owners and operators have a reasonable expectation [of privacy in] their names, addresses, and phone numbers," Appellant's Br. at 24, and that the DPPA enforces that constitutional right.

As an initial matter, we note that "there is no general constitutional right to privacy." Whalen v. Roe, 429 U.S. 589, 608 (1977) (Stewart, J., concurring) (internal quotation marks omitted). Rather, the Supreme Court has limited the "right to privacy" to matters of reproduction, see Skinner v. Oklahoma, 316 U.S. 535 (1942), contraception, see Griswold v. Connecticut, 381 U.S. 479 (1965), abortion, see Roe v. Wade, 410 U.S. 113 (1973), and marriage, see Zablocki v. Redhail, 434 U.S. 374 (1978).

Of particular importance here, neither the Supreme Court nor this Court has ever found a constitutional right to privacy with respect to the type of information found in motor vehicle records.**8** Indeed, this

_____

**8** The United States cites three Fourth Circuit cases in which it claims a constitutional right to privacy was recognized. First, in Taylor v. Best, 746 F.2d 220 (4th Cir. 1985), this Court found that a prisoner did not

19

is the very sort of information to which individuals do not have a reasonable expectation of privacy. First, "pervasive schemes of regulation," like vehicle licensing, must "necessarily lead to reduced expectations of privacy." <u>California v. Carney</u>, 471 U.S. 386, 392 (1985); <u>cf. New York v. Class</u>, 475 U.S. 106, 113 (1986) (noting that individuals have a diminished expectation of privacy in matters related to their automobiles).

Second, the same type of information is available from numerous other sources.[9] For example, the identical information can be obtained from public property tax records. As a result, an individual does not have a reasonable expectation that the information is confidential. <u>See Walls v. City of Petersburg</u>, 895 F.2d 188, 192 (4th Cir. 1990) (holding that an individual must have a reasonable expectation of confidentiality to have a constitutional right to privacy).

Third, as amici point out, there is a long history in the United States of treating motor vehicle records as public records. <u>See</u> Brief

_____

have a constitutional right to keep his family history private. In <u>Walls v. City of Petersburg</u>, 895 F.2d 188 (4th Cir. 1990), this Court held that there was no constitutional right to privacy in information found in a public record. Finally, in <u>Watson v. Lowcountry Red Cross</u>, 974 F.2d 482, 487-88 (4th Cir. 1992), this Court, without attempting to define the parameters of a right to privacy, held that the disclosure of an anonymous blood donor's identity to the court and counsel would not violate the privacy rights of the donor. None of these decisions supports the United States's arguments in this case. Indeed, in <u>United States v. Bales</u>, 813 F.2d 1289 (4th Cir. 1987), this Court held that the disclosure of an individual's social security number on a loan application did not violate the individual's constitutional right to privacy. <u>Id.</u> at 1297.

[9] If there is a constitutional right to privacy in such information, then the United States is violating the Constitution on an ongoing basis. For example, the United States operates a public database that contains the names, addresses, and medical data of every individual licensed to operate an airplane by the United States. <u>See</u> http://www.avweb.com/database/airmen. A related database permits anyone to obtain the name and address of the owner of an airplane simply by providing the number displayed on the airplane's tail. <u>See</u> http://www.avweb.com/database/aircraft.

20

of Amici Curiae at 5-20.**10** In fact, in <u>United States HHS v. FLRA</u>, 833 F.2d 1129 (4th Cir. 1987), this Court observed that an individual's name and home address "is a matter of public record in motor vehicle registration and licensing records." <u>Id.</u> at 1135 n.8.

Finally, such information is commonly provided to private parties. For instance, a State-issued driver's license is often needed to cash a check, use a credit card, board an airplane, or purchase alcohol. We seriously doubt that an individual has a constitutional right to privacy in information routinely shared with strangers.

In sum, the information found in motor vehicle records is not the sort of information to which individuals have a reasonable expectation of privacy. As such, there is no constitutional right to privacy in the information contained in motor vehicle records. Accordingly, Congress did not have the authority under Section 5 of the Fourteenth Amendment to enact the DPPA.

III.

For the reasons stated, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

PHILLIPS, Senior Circuit Judge, dissenting:

Adopted in 1994 as part of larger omnibus crime legislation, the Driver's Privacy Protection Act (DPPA), 18 U.S.C. §§ 2721-25, is a unique federal enactment designed to address the privacy and safety concerns flowing from the unfettered disclosure of personal information contained in drivers' license files maintained by state motor vehicle departments. Pigeonholing the Act into one of two narrow legal constructs that it apparently believes exclusively define the Tenth Amendment's constraints on federal power, the majority concludes

_____

**10** In addition to the briefing we received from the parties, we accepted an amici curiae brief from the States of Alabama, Idaho, and Oklahoma, and the Better Government Bureau, Inc. We thank the amici for their participation.

21

that the Act is unconstitutional because it impermissibly regulates States as States and because it is not a law of general applicability to both State and private actors. I dissent, believing that the unique structure and internal operation of the DPPA, considered in light of the harm generated by the States' own actions at which it is aimed, distinguish this case from those upon which the majority relies and compels the conclusion that the Act is consistent with both substantive and structural limitations on the exercise of federal power.**1**

The DPPA makes it unlawful for a department of motor vehicles to "knowingly disclose or otherwise make available to any person or entity personal information . . . in . . . a motor vehicle record." § 2721(a). Exceptions, most of which relate to law enforcement and other proper investigative purposes, are enumerated in the Act. See § 2721(b). States not wishing to limit themselves to the Act's enumerated exceptions may opt out by affording licensees the opportunity to prohibit disclosure of their personal information. If such an option is provided and license holders do not object, the State may release the information for any purpose. See § 2721(b)(11).

State violations of the Act trigger civil penalties. Specifically, § 2723(b) subjects "[a]ny State department of motor vehicles that has a policy or practice of substantial noncompliance with this chapter" to "a civil penalty imposed by the Attorney General of not more than $5,000 a day for each day of substantial noncompliance." Although the Act authorizes a private civil action for damages, States and their agencies may not be sued. See § 2724(a) (authorizing a civil action against any "person" who violates the Act); § 2725(2) (defining person to include "an individual, organization, or entity, but . . . not . . . a State or agency thereof"). The Act also prohibits individuals from receiving information for purposes not outlined in the Act or for otherwise receiving such information under false pretenses. See § 2723(a). Such acts are prohibited by federal--not state--law, and

_____

**1** Because I believe the DPPA satisfies structural limitations on Congress's exercise of its Commerce Clause power, I do not address the separate question whether other sources of federal power, including Section 5 of the Fourteenth Amendment, are subject to the same structural limitations and if not whether the Government may properly rely on those sources (whatever they may be) here.

22

no State is required to outlaw or punish individuals who improperly receive information or otherwise violate the Act.

Because the DPPA regulates the flow of personal information--information that is consistently in the stream of commerce and for which States receive substantial reimbursement--the only issue in this case is whether Congress may, consistent with the Tenth Amendment, impose its will on States respecting conduct uniquely engaged in by States and state actors.[2] It follows that, in exercise of its Commerce Clause powers, Congress could have, had it desired, made receipt of federal highway funds contingent on accepting DPPA's provisions. See South Dakota v. Dole, 483 U.S. 203, 206 (1987) (allowing the Secretary of Transportation to withhold federal highway money from States refusing to raise the legal drinking age). Similarly, Congress could almost assuredly have completely preempted the field of motor vehicle information disclosure, a drastic move that States would undoubtedly resist but on which, in an analogous setting, the Court has placed its seal of approval. See Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 288 (1981) (upholding Congress's imposition of a choice between state regulation pursuant to federal guidelines and complete preemption of surface mining). Instead, Congress chose to regulate the States directly, without offering the "incentive" of public funds or threatening to preempt the field.

The majority concedes, as it must, that the end object of the Act is the direct regulation of state conduct. It is not the indirect regulation of private conduct--here information use--by forcing the states directly to regulate that conduct, in the way that the states were held impermissibly compelled to regulate the waste-handling conduct of private parties in New York v. United States, 505 U.S. 144 (1992). Nor does the Act make South Carolina an executive instrument of the

_____

**2** The district court did not address whether Congress acted within its Commerce Clause power in enacting the DPPA and, as indicated, I assume the point. South Carolina casually asserts on appeal that Congress lacked this power, apparently because there was not a sufficient impact on interstate commerce. The only court to consider this issue directly easily found sufficient evidence of a "nationwide trade of DMV records" to sustain Congress's exercise of its Commerce Clause power. Pryor v. Reno, 998 F. Supp. 1317, 1326 (M.D. Ala. 1998).

23

federal government in the way the Brady Act was held impermissibly to have conscripted local law enforcement officials to enforce federal law in Printz v. United States, 117 S. Ct. 2365 (1997).

It is the direct regulation of the State activity here which distinguishes the DPPA, in the most fundamental of ways, from the federal legislation struck down respectively in New York and Printz.

Unlike the New York legislation, the DPPA does not "commandeer[ ] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." New York, 505 U.S. at 176 (quoting Hodel, 452 U.S. at 288) (emphasis added)). It is true that states that choose to disclose motor vehicle information must take steps to administer their programs in conformity with federal guidelines. But that administration will be of their own choosing and will not in any way be a "federal regulatory program." And it is settled that not every kind of federally forced state administration to comply with federal law violates the Tenth Amendment. In South Carolina v. Baker, 485 U.S. 505 (1988), the Court upheld a federally imposed requirement that public bonds issue only in registered form. Although the Tax Equity and Fiscal Responsibility Act of 1982 required States to abandon their previous bearer systems and install completely different administrative programs, the Baker Court dismissed South Carolina's argument that this burden unconstitutionally coerced state officials. The undoubted burden was, explained the Court, simply "an inevitable consequence of regulating a state activity." Id. at 514. The Court went on to say:

> That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.

Id. at 515.

The majority here seeks to avoid Baker's force by characterizing it as a case involving a law of general applicability. In the majority's view, only if the DPPA is also a law of general applicability in the way that the FLSA was considered to be in Garcia v. San Antonio Metro Transit Authority, 469 U.S. 528 (1985), the ADEA to be in

24

EEOC v. Wyoming, 460 U.S. 226 (1983), and the Tax Equity Act arguably to be in Baker, can it be upheld against Tenth Amendment challenge, and it is not such a law. I disagree with the majority's premise that only laws of such general applicability may be so upheld.

It is true that the laws upheld in Garcia and Wyoming were laws of general applicability in the sense that they imposed duties equally on state and private actors.**3** And it is true that the Court has thought that the states could find adequate protection against this sort of across-the-board federal regulation in the electoral protections afforded by the federal system. See Printz, 117 S. Ct. at 2381 (adequate to preserve the proper balance between state and federal "sphere[s] of authority"). But, the majority fails to explain the theoretical basis or constitutional theory upon which this distinction rests or applies here. Admittedly, when Congress imposes generally applicable obligations upon a State the State is at least partially acting as a market participant and at least in part for this reason must follow federal law in areas of federal concern. But the principal cases noting this feature of the challenged legislation never have intimated that only by such generally applicable legislation may Congress, consistent with the structural limitations of federalism, impose obligations on the states.

_____

**3** Actually, the tax provision at issue in Baker was not one of general applicability comparable to the "generality" of the FLSA or ADEA. The relevant Act was omnibus tax legislation dedicated to a broad range of tax issues, only one of which was the requirement that bonds issue in registered form. And the only specific provision at issue in Baker was one, § 310(b)(1), that removed tax exemptions only for publicly offered long-term bonds. It therefore imposed a burden only on state and local governments, that is to say only on those groups that issued "public" bonds.

In fact, many of the specific provisions applicable to states under the FLSA have unique application only to government actors. In West v. Anne Arundel County, 137 F.3d 752 (4th Cir. 1998), for example, we rejected a Tenth Amendment challenge to a firefighter and law enforcement exception to the overtime provisions of the FLSA, even though "the relevant provisions of the 1974 Amendments targeted only state governmental entities." Id. at 758.

25

I believe that the legislation at issue in Garcia and Wyoming (and possibly in Baker) was immune to Tenth Amendment challenge not so much--if at all--because they applied equally to state and private actors as because they directly regulated state activities rather than using the "States as implements of regulation" of third parties. New York, 505 U.S. at 160. See Thomas H. Odom, The Tenth Amendment After Garcia: Process-Based Procedural Protections, 135 U. Pa. L. Rev. 1657, 1662 (1987) (explaining that Garcia "applies only to federal statutes that directly regulate the states"). This, I believe is what most critically distinguishes the legislation upheld in Garcia, Wyoming and Baker from those few examples of invalidated legislation in which Congress took the unusual step of compelling States to invoke their legislative process (see New York) or conscripted their executive officials (see Printz) in an effort to regulate or circumscribe by indirection the action of third parties. In those cases, the Court confronted a unique question: "[t]hat is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." New York, 505 U.S. at 160. That question is not presented by the DPPA. See Vicki C. Jackson, Federalism and the Uses and Limits of Law: Printz and Principle?, 111 Harv. L. Rev. 2180, 2205 (describing the DPPA as a federal statute that does not "`commandeer' in the sense of requiring state regulation of nongovernmental actors").

The DPPA does not require that states prohibit private individuals from obtaining information in violation of its provisions. Section 2723(a) prohibits this directly by making violation of the DPPA a federal offense. In fact, the DPPA does not require that states act at all. Its provisions only apply once a State makes the voluntary choice to enter the interstate market created by the release of personal information in its files. As did the compelled adoption by the states of a registered bond system, the DPPA only "regulates state activities: it does not . . . seek to control or influence the manner in which States regulate private parties." Baker, 485 U.S. at 514. For this reason, New York and Printz do not require invalidating this Act.

Nor do I believe that any other constitutionally-based federalism principle, perhaps underlying Printz and New York at a deeper level, requires its invalidation. This congressional enactment requires only that states choosing to regulate the release of particular information

26

in their possession into the stream of interstate commerce do so in a way Congress deems appropriate. Elected federal officials have made a considered policy determination that unfettered release of this information is not in the public interest because of privacy concerns and because it would be injurious to the interstate market in information. Whether Congress is right or not in that determination is irrelevant. It is sufficient for our purposes that Congress deems injurious a specific state activity in which by definition private actors do not engage. To assume that Congress could only regulate the states' conduct directly if it also equally regulated comparable private conduct (even where none in fact exists) seems to me to bear no relationship to any concept of federalism implicit in the Tenth Amendment as interpreted by the Supreme Court.

In New York, the Court explained why the peculiar practices it confronted there offended core notions of state sovereignty while other, perhaps more coercive, action such as field preemption did not:

> [W]here the Federal Government compels States to regulate, the accountability of both state and federal officials is diminished. If the citizens of New York, for example, do not consider that making provision for the disposal of radioactive waste is in their best interest, they may elect state officials who share their view. That view can always be preempted under the Supremacy Clause if it is contrary to the national view, but in such a case it is the Federal Government that makes the decision in full view of the public, and it will be federal officials that suffer the consequences if the decision turns out to be detrimental or unpopular.

New York, 505 U.S. at 168. It is this concern for political accountability that drives the Court's decision in New York and provides the theoretical basis and legal authority for invalidating a federal statute that otherwise was within Congress's power to enact. But political accountability is not a concern with the DPPA because with it Congress is doing the regulating and Congress will pay any political price for any resulting electoral disaffection.

Finally, the majority's suggestion that Congress lacks authority to regulate "States as States"--a reference presumably to the now aban-

27

doned multifaceted inquiry adopted by the Court in National League of Cities v. Usery, 426 U.S. 833 (1976)--simply has no current force.**4** Pursuant to Art. VI, cl. 2, the federal government is supreme within its domain. So long as it acts within the substantive constraints imposed by the Constitution, it may direct or forbid the states to do any number of things by either fully or partially exercising its fundamental power of preemption. See, e.g, Gade v. National Solid Wastes Management Ass'n., 505 U.S. 88 (1992) (sustaining the power of the federal government to limit state attempts to regulate in the field of occupational safety); Department of Energy v. Ohio, 503 U.S. 607, 611-12 (1992) (sustaining the Clean Water Act's regulation and limitation of state authority to control the release of pollutants into waterways); Federal Energy Regulatory Commission (FERC) v. Mississippi, 456 U.S. 742, 75967 (1982) (affirming the power of the federal government to regulate directly state-run electric and gas utilities).

By regulating directly the actions of states that choose to enter the personal information market, Congress is doing no more than exercising this power of preemption. The DPPA does nothing different from, for example, that done by federal regulation of municipal sewage and state-owned solid waste disposal systems. See Robert W. Adler, Unfunded Mandates and Fiscal Federalism: A Critique, 50 Vand. L. Rev. 1137, 1156-57 & 1202-03 (1997) (distinguishing direct federal regulation of States from federally imposed requirements that States regulate third parties). Nor is the DPPA's regulation different in critical respects from federal regulation of any number of other state

_____

**4** In Hodel, 452 U.S. at 286, the Court explained the since rejected theory of National League of Cities by quoting language from that decision that closely resembles the majority's understanding of current Tenth Amendment jurisprudence as I read its opinion.

> [W]hen Congress attempts to directly regulate the States as States the Tenth Amendment requires recognition that "there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner."

Id. at 286-87 (quoting National League of Cities, 426 U.S. at 845).

28

activities in areas subject, if Congress chose, to full preemption. One need look no further for an example than to Congress's adoption of the National Voter Registration Act (NVRA) and the subsequent rejection of Tenth Amendment challenges to its provisions. <u>See</u> <u>ACORN v. Edgar</u>, 56 F.3d 791 (7th Cir. 1995) (sustaining direct regulation of state voter registration practices under the NVRA); <u>accord</u> <u>Wilson v. United States</u>, 878 F. Supp. 1324 (N.D. Cal. 1995). Other examples that come readily to mind might include direct federal regulation of state-owned liquor monopolies or lottery facilities. Surely it is no basis for invalidating such regulations that no private equivalent could be found in the particular area of regulation. Would the requirements of the DPPA really be any less intrusive on state sovereignty interests if they were part of broad privacy protections involving private as well as public holders of sensitive information? <u>See, e.g.</u>, Cable Communications Privacy Act, 47 U.S.C. § 551; Electronics Communications Privacy Act, 18 U.S.C. § 2702; Fair Credit Reporting Act, 15 U.S.C. § 1681b; Video Privacy Protection Act, 18 U.S.C. § 2710. I do not see how, hence I do not see how the DPPA's lack of general applicability requires its invalidation.

I would reverse the judgment holding the DPPA unconstitutional as a violation of the Tenth Amendment.

29